BARBARA BROWN, APPELLANT, V. CITY OF OMAHA, APPELLEE.

160 N. W. 2d 805

Filed August 30, 1968. No. 36846.

Lathrop & Albracht and Daniel G. Dolan, for appellant.

James E. Fellows and Frederick A. Brown, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

McCOWN, J.

This is an action at law against the City of Omaha, a municipal corporation, for personal injuries allegedly sustained by the plaintiff as the result of the negligence of a policeman in the operation of a police patrol car. The city filed a demurrer based upon governmental immunity from liability for tort actions. The demurrer was sustained by the trial court and the plaintiff has appealed. The issue is whether the traditional rule of governmental immunity from tort liability should be adhered to.

Sovereign immunity has been said to stem from the concept that "the King can do no wrong." The traditional judicial translation of this concept proceeds on the basis that it is better that a citizen injured by the negligence of the governmental entity should alone suffer the loss rather than the "sovereign" governmental unit. This court long ago adopted the traditional common law view that a public entity engaged in governmental activities is not liable for negligence. Immunity has been "based upon a public policy which subordinates mere

private interests to the welfare of the general public." Gillespie v. City of Lincoln, 35 Neb. 34, 52 N. W. 811, 16 L. R. A. 349. Why the "sovereignty" doctrine was ever extended to municipalities and local governmental units "is one of the mysteries of legal evolution." Borchard, Government Liability in Tort, 34 Yale L. J. 1, 4 (1924).

Even under the traditional common law rule of immunity, activities of a municipal corporation which were judicially classified as "proprietary" rather than "governmental" in nature were not immune. Greenwood v. City of Lincoln, 156 Neb. 142, 55 N. W. 2d 343, 34 A. L. R. 2d 1203. This concept has recently been extended to the state itself. See, Stadler v. Curtis Gas, Inc., 182 Neb. 6, 151 N. W. 2d 915.

The rationale behind the "governmental-proprietary" distinction is that when a public entity is involved in a governmental function, it is immune from tort liability, but when involved in a proprietary function, it loses its cloak of immunity. Under this rule, the citizen who has been negligently injured by a vehicle of the city water department may recover, but the citizen who has been negligently injured by a vehicle of the city health department of the same city cannot recover. Such distinctions defy logical explanation.

Particularly during the past 10 years, judicial opinions in increasing volume have pointed out the fact that the reasons underlying the traditional wide-sweeping rule of sovereign immunity have virtually disappeared in modern society. The rule is today no longer just, reasonable, nor defensible. The judicial attack on the traditional rule of governmental immunity has resulted in judicial abrogation of the doctrine in several states. See, Muskopf v. Corning Hospital Dist., 55 Cal. 2d 211, 11 Cal. Rptr. 89, 359 P. 2d 457; Molitor v. Kaneland Community Unit Dist. No. 302, 18 Ill. 2d 11, 163 N. E. 2d 89; Hargrove v. Town of Cocoa Beach (Fla.), 96 So. 2d 130, 60 A. L. R. 2d 1193; McAndrew v. Mularchuk, 33 N. J.

172, 162 A. 2d 820; Williams v. City of Detroit, 364 Mich. 231, 111 N. W. 2d 1; Holytz v. City of Milwaukee, 17 Wis. 2d 26, 115 N. W. 2d 618; Stone v. Arizona Highway Comm., 93 Ariz. 384, 381 P. 2d 107. See, also, Hink and Schulter, Some Thoughts on the American Law of Governmental Tort Liability, 20 Rutgers L. Rev. 710 (1966); A Comment on Governmental Tort Immunity in Kansas, 16 Kan. L. Rev. 265 (Jan. 1968).

The major conflict is no longer whether the traditional doctrine of governmental immunity from tort liability is obsolete and unjust, but, instead, lies in the area of the responsibility and power of the courts to reform it. For a discussion of the relative responsibility of courts and legislatures in this area, see, The Role of the Courts in Abolishing Governmental Immunity, Duke L. J. (1964), 888; Peck, The Role of the Courts and Legislatures in the Reform of Tort Law, 48 Minn. L. Rev. 265.

Many courts in the past have held that any change in the doctrine of governmental immunity must be made by the legislature and not by the courts. More recently, although recognizing that the doctrine of governmental immunity was a court-made rule and of judicial origin, some courts have nevertheless refused to abrogate or modify it because of the fact that the doctrine has been adhered to for many, many years. See, for example, Boyer v. Iowa High School Athletic Assn., 256 Iowa 337, 127 N. W. 2d 606.

"The dozen or so state supreme courts that have recently abrogated the immunity doctrine have recognized that an unjust and irrational principle cannot be allowed to persist on the hollow ground that changing an antiquated rule is a job for the legislature." 16 Kan. L. Rev. 265 at page 273.

Section 49-101, R. R. S. 1943, provides: "So much of the common law of England as is applicable and not inconsistent with the Constitution of the United States, with the organic law of this state, or with any law passed or to be passed by the Legislature of this state, is adopted

and declared to be law within the State of Nebraska."

In State v. Tautges, Rerat & Welch, 146 Neb. 439, 20 N. W. 2d 232, this court held: "The courts have power to modify the common law, adopting such of its principles as are applicable and rejecting such others as are inapplicable." This court cited with approval the reasons of the soundness of that rule: "The common law by its own principles adapted itself to varying conditions and modified its own rules so as to serve the ends of justice as prompted by a course of reasoning which was guided by these generally accepted truths. One of its oldest maxims was that where the reason of a rule ceased, the rule also ceased, and it logically followed that when it occurred to the courts that a particular rule had never been founded upon reason, and that no reason existed in support thereof, that rule likewise ceased, and perhaps another sprang up in its place which was based upon reason and justice as then conceived. No rule of the common law could survive the reason on which it was founded. It needed no statute to change it but abrogated itself."

Another reason sometimes relied on as supporting non-interference by the judiciary in the field of governmental immunity is the contention that the Legislature has preempted the field. The legislation in Nebraska dealing with removal of governmental immunity is extremely limited, and could properly be said to represent only a few isolated areas of a very large field. Justice Traynor of California effectively responded to the preemption argument in the following language. "We are not here faced with a situation in which the Legislature has adopted an established judicial interpretation by repeated re-enactment of a statute * * * Nor are we faced with a comprehensive legislative enactment designed to cover a field. What is before us is a series of sporadic statutes, each operating on a separate area of governmental immunity where its evil was felt most. Defendant would have us say that because the Legisla-

ture has removed governmental immunity in these areas we are powerless to remove it in others. We read the statutes as meaning only what they say: that in the areas indicated there shall be no governmental immunity. They leave to the court whether it should adhere to its own rule of immunity in other areas." Muskopf v. Corning Hospital Dist., *supra*. It should be pointed out also that at the time of the California decision, California had far more legislation on the subject than there is in Nebraska.

We are convinced that the rule of governmental tort immunity is of judicial or common law origin, and that this court has power to modify it in the absence of legislative action to the contrary.

Both the Legislature and this court have power to act to change the doctrine and it may well be that the Legislature will have the ultimate word. This would seem to be a poor reason to avoid the court's obligation to modify the common law to serve the requirements of justice in a modern society. We ought not to thrust upon the Legislature the sole responsibility for injustice on the ground that, "Thus it was said in the reign of Henry IV," nor even on the ground that any change would constitute the traditionally condemned heresy of judicial legislation.

We must recognize, however, that the doctrine of governmental immunity from tort liability underlies a very broad field and that the legislative process and procedures can be more effectively applied to a comprehensive solution, while the court's processes and procedures are more effectively directed to a solution more narrowly limited to specific facts framed in litigated cases. Any modification ultimately shaped by this court should be limited to torts, and should not be construed as imposing liability on any governmental body in the exercise of what might be termed "ministerial or discretionary functions" nor on the exercise of legislative or

judicial or quasi-legislative or quasi-judicial functions. See Holytz v. City of Milwaukee, *supra*.

The nature of the activities and the harm, fiscal consequences in general, analogies in private law, the public interest in effective, efficient governmental service, and the fact of a long-continued assumption of nonliability, together with the broad coexistent authority of the Legislature to act, all dictate a gradual judicial transition. That transition is preferably accomplished by the process of inclusion and exclusion, case by case, and step by step.

Automobile accidents do not fall within the category of reasonable exceptions to nonliability which might foreseeably be carved out of any future framework of modification. The general legislative policy to accept public financial responsibility in this area is already apparent in section 60-1008, R. S. Supp., 1967. That section requires liability insurance for all trucks, automobiles, snow plows, road graders, or other vehicles of state agencies.

The record here does not reveal whether or not the City of Omaha or other cities or governmental subdivisions carry liability insurance on motor vehicles. The existence of such insurance has in itself been treated as a waiver of immunity to the extent of such insurance in the states of Georgia, Indiana, Minnesota, Oregon, Wisconsin, North Carolina, Illinois, Kentucky, and Tennessee. See Annotation, Liability or Indemnity Insurance Carried by Governmental Unit as Affecting Immunity from Tort Liability, 68 A. L. R. 2d 1437, and supplement thereto. The availability of insurance eliminates one of the reasons sometimes used in support of traditional immunity—the catastrophic loss to smaller governmental units.

We therefore hold that cities and all other governmental subdivisions and local public bodies of this state are not immune from tort liability arising out of the ownership, use, and operation of motor vehicles. Contrary decisions are overruled to the extent of their inconsistency.

To enable the various public bodies to make financial arrangements to meet this liability, this holding applies to all causes of action arising after September 29, 1968, 30 days following the filing date of this opinion. In respect to other causes of action, the new rule applies if, but only if, the city or other governmental subdivision was insured against such liability on the date the claim arose, and then only to the extent of the maximum applicable amount of its insurance coverage. For the reasons set forth in Myers v. Drozda, 180 Neb. 183, 141 N. W. 2d 852, this decision is applicable to the case at bar.

The judgment is reversed and the cause remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.

NEWTON, J., dissenting.

The present era has witnessed a more or less worldwide spread of the doctrines of paternalism. Peoples of many nations are no longer content with the old established practices of government. They are no longer content with such limited forms of government as provide the simple and essential governmental services such as streets, highways, and fire and police protection. The decline of personal initiative and responsibility, and the growth of governmental paternalism is apparent in the broad social security concepts now engrafted into everyday life. We now have medicare, social security, and an enormous expansion of a myriad of welfare programs, with new and broader programs of similar character, such as a guaranteed minimum income, being urged. Such programs are all administered, and many financed, by the public. The theory that government "owes each of us a living" and should care for us "from the cradle to the grave" has achieved widespread adoption. This type of thinking has also branched out into certain facets of the law and is resulting in the erosion of certain legal principles of long standing. The idea that human or individual rights stand supreme above all other considerations, including

those of society generally, has received great impetus. Today, from a practical legal standpoint, the word "sedition" has been deleted from the English language, and in some instances the personal privileges of confessed criminals take precedence over the interests and welfare of actual and potential victims. Rather than restrain the wrongdoer it is urged by some that we should recompense the victimized at public expense.

One outgrowth of this general social unrest has been the advocacy of public tort liability and the abolition of the "immunity doctrine." The "spread the loss" theory has become popular in a number of jurisdictions and many writers of legal theses urge in regard to governmental responsibility that the "fault" concept be abandoned and absolute liability for injury or damage adopted. Individual self-reliance and the interests of society must be subjected to other considerations in the interest of promoting the "cradle to the grave" philosophy.

As is generally true the elements of social philosophy mentioned are not entirely devoid of merit. The danger lies in extremism. As a pendulum swings from one extreme to another, just so do social movements swing from one extreme to another and the law which seeks to administer to modern needs likewise is in danger of adopting elements of an extremist philosophy.

A favorite cliché of the many who advocate a complete abolition of the immunity doctrine is that it is adopted from an English theory that "the King can do no wrong." The falsity of this statement is apparent. Long before the colonization and settlement of America, English law provided remedies against the crown. See, 77 Harvard Law Review 1, Jaffe, Suits Against Governments and Officers: Sovereign Immunity; and Muskopf v. Corning Hospital Dist., 55 Cal. 2d 211, 11 Cal. Rptr. 89, 359 P. 2d 457. To the contrary, the immunity theory has been based on what was considered to be the necessity of protecting the interests of the public, and

the concept that since all rights were conferred by government it was illogical to hold the law giver liable in tort actions. Even today many of the most vigorous advocates of abolishment of the immunity doctrine concede, that it is still necessary to place certain restraints upon it as the very nature of many governmental activities require such protection. See 10 U. C. L. A. Law Review 463 (1963), Van Alstyne, Governmental Tort Liability: A Public Policy Prospectus; 3 Davis, Administrative Law Treatise, § 25.11, p. 482.

The, opinion offered in the present case, although it states that the rejection of the doctrine of governmental immunity should be dealt with on a case-by-case basis, in effect, at one fell swoop, completely abolishes the immunity rule in Nebraska. In this respect the proposed remedy is as extreme and unreliable as the evils it purports to cure. It must be borne in mind that many of our essential governmental activities are of a nature, and entailing such a great element of risk insofar as tort liability is concerned, that private enterprise would find them unprofitable and would refuse to indulge in them, yet the public must perforce do so. Governmental administration of fire and police protection, water and air pollution control, health hazards, water and soil conservation, and flood control, are but a few of such instances. Public and private entities are so significantly different that it woud be inadvisable to treat them alike for tort purposes. The broad scope of governmental activities and the benefits they confer on the public render it unwise in many instances to burden them with liability for damages in tort.

Also some consideration must be given to the ability of the public to bear the expense encountered. We have numerous small villages with assessed valuations of $100,000 or less. They do not have, the ability or means to maintain streets, fire and police protection, etc., on an adequate basis. Yet it is not unlikely in the present day that such a village could be subjected to a

judgment of a half million dollars, many times exceeding the actual value of the entire village. Even larger governmental units might find it necessary at times to curtail essential public services. It is true that a certain measure of protection may, at least in some instances, be obtained through insurance, but insurance rates are based on risk and risk may render insurance unavailable or prohibitive. In any event, for the courts to direct governmental units to carry insurance, either directly or by generating conditions making it requisite, would be a clear invasion of the legislative function. Heretofore in recognition of the immunity rule, our statutes have specified certain instances in which municipalities and governmental subdivisions might be held responsible in actions for tort and either directly or by implication have authorized the payment of claims so authorized. The majority opinion now broadens the field of tort liability with reference to municipalities and governmental subdivisions. Yet, it does not and cannot authorize the payment of such claims. Even the majority must recognize that such authorization is exclusively a legislative function. The Legislature has in some instances prescribed limits on the taxing powers of these public bodies and in others, has authorized the expenditure of public money only for certain designated purposes. If these public bodies are to be made liable for judgments in tort, provisions for payment of such judgments and the raising of funds required must also be made, again a strictly legislative function.

A few of the problems that will be encountered deal with legislative, judicial, quasi-legislative, quasi-judicial, and discretionary acts of public departments, officers, and agents. Nearly every legislative act damages someone. The same is true of judicial acts and discretionary decisions. Businesses are often destroyed or severely damaged by such means. For example, zoning ordinances may damage property values, forbidding the sale of drugs or merchandise considered harmful may injure

a business, requiring a reduction in a public utility's rates is damaging, a President or Congressman may be negligent in issuing an unjust executive order or in voting for an ill-conceived bill, or a governmental board may wrongfully change interest rates or deny a certificate of public convenience and necessity. In addition a multitude of questions may arise in regard to war losses, negligence of the armed forces, enforcement of antitrust laws, law enforcement including the failure to properly enforce criminal laws and to apprehend criminals, negligent failure to maintain water pressures for fire fighting purposes, failure to quarantine or doing so wrongfully, failure of inspectors to detect and require guards against dangerous conditions, and an infinite variety of other situations.

The public cannot guarantee a citizen against all errors or defects he may encounter. Life in any organized community requires a certain number of sacrifices and risks. In those jurisdictions which have adopted Tort Claims Acts this has been recognized, as witness the exceptions found in the Federal Tort Claims Act. It is much simpler and more practical to lay out the circumstances under which recovery may be had than to generally abolish governmental immunity and then define the specific and endless cases in which recovery cannot be justified or allowed. It would take a court, working on a case-by-case basis, at least a century, and perhaps several, to work out an acceptable basis encompassing public tort liability. This points up the fact that issues dealing with governmental immunity and tort liability are essentially legislative in nature and from a practical standpoint cannot be satisfactorily resolved by judicial action. If the present system be deemed obsolete and unjust it will nevertheless not be helpful to plunge the public into a morass of uncertainty by the adoption of an activist judicial philosophy. Problems enough will arise even after the best-considered legislative action on the subject has been taken.

We should not lose sight of the fact that the doctrine of governmental immunity is an ancient one and well rooted in the common law of this country. Counties, cities, school districts, and other governmental subdivisions are to a large extent creations of the Legislature. In Nebraska a few of our laws governing such entities are of constitutional origin but most have resulted from legislative action, and *all* that are pertinent to the question under consideration came into being in recognition of the constitutional and common law precept of governmental immunity from tort liability. Examination of the statutes of Nebraska will reveal that the Legislature has not been completely insensitive to situations resulting from the application of the immunity rule. By statute, the rule has been suspended or waived in numerous instances specified by the Legislature. One of the better known exceptions is that authorizing recovery where injuries or damage is sustained by reason of the negligent and defective maintenance of highways. The destruction of that doctrine will require an extensive overhauling of all of our laws bearing on the duties and responsibilities of these entities in the field of torts. It is a major undertaking and one which I am informed is now under consideration. The Legislature alone, certainly not this court, can adequately cope with the situation.

Alexander Hamilton once wrote that courts " 'must declare the sense of the law; and if they should be disposed to exercise WILL instead of JUDGMENT, the consequence would equally be the substitution of their pleasure to that of the legislative body.' " This aptly describes the present situation.

WHITE, C. J., and CARTER, J., join in this dissent.

CARTER, J., dissenting.

I adhere to my dissent in Stadler v. Curtis Gas, Inc., 182 Neb. 6, 151 N. W. 2d 915, and the dissents of White, C. J., and Newton, J., filed in that case. It is not my intention to reiterate here what was said there.

Every state is inherently vested with certain sovereign powers necessary for its own preservation. Among these powers are the power to tax, the power to take property for public use, and the immunity from suit. The majority opinion chooses to deal with the sovereign immunity from suit doctrine under the old cliché, "The King can do no wrong." This cliché is nothing more than what it purports to be. It seems to me that we should call things by their right names in dealing with a matter as important as sovereign immunity from suit and not be misled into a discussion of clichés and hackneyed expressions that serve only to divert the court from the real issues of the case. Another contention usually advanced in attacking sovereign immunity from suit is that a court-made rule of law can be vacated by the courts that made it. But sovereign immunity is an inherent power of the political state, and, in so holding, the courts merely declare the existence of this inherent sovereign power which has been recognized since the beginning of law by English speaking peoples. In advancing the foregoing assertions, opponents of the doctrine are grasping for reasons to circumvent a well-established and long-followed sovereign power which offends their personal sense of justice.

Immunity from suit against a sovereign state has always resulted in hardship on those falling within its scope. It is true that the development of new means of transportation, our ever-increasing population, and the growing complexity of our social order has multiplied the hardships and uncompensated wrongs resulting from the immunity from suit doctrine. While this could and possibly should bring about a change in public policy as determined by the Legislature, it does not have the effect of changing the principle of law involved. Limitations of sovereign powers, absolute in character, are the province of the Legislature and not the courts.

But whether or not the rule of the state's sovereign immunity from suit originated under the common law

of England or whether or not it was judge made or merely declared, is of little consequence in this case for the simple reason that it has been preserved to the state by the Constitution. Article V, section 22, of the Constitution of Nebraska provides: "The state may sue and be sued, and the legislature shall provide by law in what manner and in what courts suits shall be brought." This constitutional provision is not self-executing. In Gentry v. State, 174 Neb. 515, 118 N. W. 2d 643, this court, in referring to Article V, section 22, Constitution of Nebraska, said: "This provision permits the state to lay its sovereignty aside and consent to be sued on such terms and conditions as the Legislature may prescribe. This provision of the Constitution is not self-executing. Legislative action is necessary to make it available." See, also, State ex rel. Davis v. Mortensen, 69 Neb. 376, 95 N. W. 831; Anstine v. State, 137 Neb. 148, 288 N. W. 525; Callen v. State, 137 Neb. 192, 288 N. W. 547; Greenwood v. City of Lincoln, 156 Neb. 142, 55 N. W. 2d 343, 34 A. L. R. 2d 1203. In the Anstine case, we said: " 'It is usually said that statutes authorizing suit against the state are to be strictly construed, since they are in derogation of the state's sovereignty. Consequently, it is generally essential that the consent of the state to be sued be given expressly and by clear implication.' "

"The rule of non-liability of the state for the torts of its officers, agents, and servants applies to those agencies through which the state acts in the administration of government as well as to the state itself." 49 Am. Jur., States, Territories, and Dependencies, § 78, p. 291. "Generally, the political subdivisions of the state, just as the state itself, are not liable for torts committed in the exercise of governmental functions unless made liable by express enactments of the legislature, except where the acts complained of, in effect, constitute a taking of private property for public use without just compensation; * * *." 81 C. J. S., States, § 131, p. 1145. See, also, State ex rel.

Davis v. Mortensen, *supra;* Anstine v. State, *supra;* Greenwood v. City of Lincoln, *supra.*

In the instant case there is no statute providing in what manner and in what court the suit could be brought as required by the Constitution. The majority opinion makes no reference to Article V, section 22, Constitution of Nebraska, nor does it even purport to show compliance with this constitutional limitation on sovereign immunity of the state from suit. In plain terms, the majority opinion chooses to ignore the Constitution and to determine the case on the theory that the Constitution is applicable unless matters appearing to be of great public policy decree otherwise.

It is true that some courts have ventured into the thorny thicket of attempting to avoid the alleged inequitable results of the sovereign immunity doctrine. In most instances, such courts have created more problems than they have solved. It is quite clear that these courts have been led astray from fundamental concepts by activist writers in law journals and reviews who have become so obsessed with what they term the inequities of the doctrine that the end appears to justify the means. Most of these writers concede that the remedies for such inequities rest with the legislatures and, being dissatisfied with the inaction of legislatures in keeping pace with their ideas, seek a way to have the courts compensate for the alleged failures of legislatures in this area. In bringing this about, the fact that judicial legislation becomes necessary does not seem important as is so often the case by those who become obsessively compulsive in righting what they believe to be a great public wrong.

The doctrine of the immunity of the state from suit is generally conceded to be a legislative problem which can be limited by the Legislature in determining the public policy of the sovereign state. This is recognized by the majority opinion when it states: "* * * it may well be that the Legislature will have the ultimate word." The fact that the Constitution has already placed

the responsibility to limit or relax the sovereign immunity of the state from suit upon the Legislature hardly warrants the assumption that this court is thrusting upon the Legislature the sole responsibility "for injustice." That responsibility belongs with the Legislature by constitutional provision. The inference that this court should not restrain its sympathy for the Legislature and its problems in the immunity field and render its unsolicited and activist aid even though it would constitute the "traditionally condemned heresy of judicial legislation," hardly warrants the conversion of this court into a mythical House of Lords with both legislative and judicial powers.

One ought not feel obligated to suggest that our state government is divided into three branches no one of which shall perform the functions of the others. Nor ought one feel the necessity for suggesting our sworn duty is to support and defend the Constitution of Nebraska; not to subvert its provisions. Nor ought one be surprised at the eyebrow-lifting that would follow the announcement of this court that it will impose its unsolicited aid upon the Legislature notwithstanding that it "would constitute the traditionally condemned heresy of judicial legislation." In addition thereto the majority opinion arrogates to the court the right to pick and choose the case which shall and which shall not be subject to the doctrine of sovereign immunity. In the one instance the court in effect says that the state immunity from suit does not exist, in the other that it does. Rule by law instead of men will suffer a serious relapse with the release of this opinion.

The boundary between responsible self-government and arbitrary, irresponsible government is "the rule of law." Never has the line become so thin and shadowy as now. Ironically, it is within our courts that the most serious threat to the rule of law is developing. Too often, judges strain to arrive at a "just" result in a case in the light of their own philosophies and socio-economic

values with settled legal principles being accorded little or no weight. As a result, law is rapidly losing its certainty, stability, and continuity. Jurisprudence is becoming the handmaiden of sociology. As Justice Cardozo once sagely remarked: "Lawyers who are unwilling to study the law as it is, may discover, as they think, that study is unnecessary; sentiment or benevolence or some vague notion of social welfare becomes the only equipment needed. I hardly need to say that this is not my point of view."

Carried to the extreme such a philosophy is currently described as activism which is in fact a negation of the rule of law. Out of the vast testing by the human experiences of the past, we have erected a system of law and courts that it is our duty to support and improve. Its importance focuses on the judge. But if the mind of the judge is closed and he recognizes no law save his own predilections, then our shelves of law books, the marble columns of our temples of justice, and the black robes of judicial integrity are but superficial symbols cloaking a travesty. Among the fundamental obligations of the judge is the duty to separate the activist writings of pseudo-legal experts, seeking to give credence to their personal philosophy of "justice" and "right," from the established law as supported by the age-old principle of stare decisis until, as in the instant case, change is made by the proper authority. The twisting and stretching of law to accommodate the furtherance of a public policy, however meritorious it may be, is not the function of the courts.

It is for the foregoing reasons in answer to what I consider a basic attack upon our fundamental system that I voice my vehement dissent to the majority opinion of this court.

WHITE, C. J., and NEWTON, J., join in this dissent.

BOSLAUGH, J., concurring.

The City of Omaha, Nebraska, has never been immune from suit. It has been subject to suit since the date of

its incorporation in 1857. See Laws 1857 (Third Territorial Sess.), p. 193. The matter was not discussed in the opinion of the court because there was no issue concerning it.