557 P.2d 604
**Frances OLSEN, Plaintiff-Respondent,**

v.

**Wilfred L. OLSEN, Defendant-Appellant.**

**No. 12022.**

Supreme Court of Idaho.

Nov. 17, 1976.

Rehearing Denied Dec. 9, 1976.

Ben Peterson of Baum & Peterson, Pocatello, for defendant-appellant.

Gordon S. Thatcher of Rigby, Thatcher & Andrus, Rexburg, for plaintiff-respondent.

DONALDSON, Justice.

Wilfred L. Olsen, defendant-appellant, petitioned the district court for an order

modifying a decree of divorce entered on the 1st day of March, 1946. The decree ordered Olsen to pay Mrs. Olsen $100 per month for each of two minor children, and further to pay $200 per month as alimony until Mrs. Olsen remarried. Olsen moved the court to modify the decree on the alleged grounds of a material and permanent change in his circumstances. The district court denied Olsen's motion to modify on the basis that Olsen failed to show a sufficient change in his circumstances and Olsen has appealed.

Olsen claims that his retirement from the active practice of medicine has reduced his earnings, and constitutes a change in his financial ability to pay alimony. The district court found that Olsen's taxable income for 1972 and 1973 was approximately $45,000. After the doctor's retirement, his income under a retirement provision of an inter-vivos trust was $19,762. Additionally, the court found that Olsen received from social security the sum of $2,639.20, for a total income of $22,451.43. Olsen listed his estimated living expenses for 1975 as $15,377.52, including $437 for malpractice insurance. Olsen's estate included a trust with a principal at the time of trial in excess of $200,000.

Mrs. Frances Olsen testified that she too has experienced a change in her financial circumstances. Her income for 1975 was reduced as a result of mandatory retirement upon reaching the age of 65. The court found that her 1974 income was $14,200. Mrs. Olsen testified at trial that her 1975 income is $536 a month from retirement, which totals $6,432 per year. Additionally, Mrs. Olsen has a savings account in the amount of $30,000 from which she receives interest monthly in the amount of $125. She also receives each month $200 as alimony payment, making her current monthly income a sum of $861 or $10,332 annually. Mrs. Olsen's current living expenses total the sum of $911.08 per month or $10,933 annually. Mrs. Olsen also owns a lot worth approximately $14,000 but which she has been unable to sell for five years.

The trial court concluded that while there had been a change in the financial condition of appellant since the entry of the divorce decree, it was not sufficient to justify a modification of the decree and the elimination of alimony.

■ Appellant claims that the court erred in finding that his financial position had decreased and yet refusing to eliminate the alimony payments from the decree. In determining whether alimony payments are just the court must consider the correlative needs and abilities of both parties. *Shepard v. Shepard*, 94 Idaho 734, 497 P.2d 321 (1972).

■ Here, while it is true that Olsen's income from his medical practice has decreased substantially due to his retirement, it is also true that he admits that he will return to active practice if he finds it "necessary." Additionally, the court may consider all sources of income, including pensions, in ascertaining Olsen's ability to pay alimony; and the record shows that the appellant has income of nearly $20,000 annually from a trust fund.

Mrs. Olsen, as already noted, reached mandatory retirement age in 1974 and has had her annual income reduced from $14,000 to $10,300 including the alimony. With the continuance of the $200 per month alimony, she still will be unable to meet her expenses without reaching into her savings or reducing her standard of living.

■ The moving party has the burden of establishing a material, permanent and substantial change in circumstances. *Larkin v. Larkin*, 85 Idaho 610, 382 P.2d 784 (1963); *Daniels v. Daniels*, 82 Idaho 201, 351 P.2d 236 (1960). It was the trial court's conclusion that appellant failed to meet the burden. As the resolution of this question rests within the discretion of the trial court it will not be disturbed on appeal unless an abuse of discretion is shown.

*See Embree v. Embree*, 85 Idaho 443, 380 P.2d 216 (1963); *Jarvis v. Jarvis*, 218 Kan. 679, 544 P.2d 1384 (1976); *Ridge v. Ridge*, 542 P.2d 189 (Utah 1975). It is our opinion that no such abuse of discretion occurred in this case.

Affirmed. Costs to respondent.

McFADDEN, C. J., and BAKES, J., concur.

SHEPARD, Justice (dissenting).

The parties hereto were divorced following a ten year marriage. Thereafter the appellant faithfully paid his wife for the support of the children of the marriage until they reached majority. Following the divorce and for the ensuing thirty years, he also faithfully, conscientiously and without interruption paid alimony to his former wife. The majority opinion holds that the trial court did not abuse its discretion in finding that the appellant failed to prove a material, permanent and substantial change in the correlative needs and abilities of the parties.

I dissent for two reasons. First, the standard to be applied to questions of alimony was enunciated by a unanimous Court in *Phillips v. Phillips*, 93 Idaho 384, 462 P.2d 49 (1969), and in my opinion the application of that standard to the facts of this case clearly demonstrates that the petitioner amply satisfied his burden of proof. Petitioner's sole error, if error it was, was failure to apply for a modification at an earlier period of time.

Secondly, I believe that the facts of the instant case emphasize the need for re-examination of the entire concept of alimony and the continuing viability of that concept in contemporary society. Put in different words, the question facing the Court is whether a judicially imposed system of involuntary servitude is to be continued wherein one human being is placed in bondage to another for what is effectively the remainder of his natural life.

I.

This Court enunciated the standard governing the instant action in *Phillips*. There we affirmed the termination of alimony to an ex-wife who was found "able to support herself without the continued assistance of her former husband." It was intended that that opinion would clarify principles with respect to the doctrines of "merger" and "integration" which had been vexing problems in the law of domestic relations in this jurisdiction. However, what was described as the "larger question" therein presented and ruled upon was the concept of alimony.

The issue in *Phillips* was phrased in terms of the conflicting policy considerations which result from society's interest in avoiding the burden placed upon it by a divorcee unable to care for herself as contrasted with the burden placed upon her former husband by subjecting his future income to a perpetual lien. I had understood until today that this Court had chosen to strike a balance in these concerns by restricting alimony awards to those circumstances where the inability of the former wife to care for herself and the potential burden upon society were both real and established. I had also labored under the belief until the instant case that absent establishment of the wife's need and general inability the matter of the abilities of the ex-husband did not require consideration. These impressions are preserved in the following statement from *Phillips*:

> "When two people are divorced from each other, as we have said herein, there are certain obligations incumbent upon our courts. The first and most important thereof is to make provision for the custody, support and maintenance of the minor children, if any, of the parties. Thereafter the court should arrive at an equitable distribution of the community property accumulated by the parties in consideration of all of the circumstances. Thereafter the parties should go their

own way with a dissolution of all obligation and debts to each other. Unfortunately, ideal circumstances do not always exist and the situation must be modified according to the wisdom and discretion of the trial judge. If circumstances show the needs and correlative abilities of the parties, we are confident that alimony or wife support will continue to be awarded.

"On the one hand, no ex-wife need be cast onto the public assistance rolls and be a burden upon society if she is unable to care for herself and her former husband has the ability to contribute to her support and maintenance. We emphasize that our statement is conditioned upon the inability of the wife to care for herself and not her unwillingness to do so. On the other hand, no man should be required to go through life following divorce with the financial millstone of a vengeful ex-wife hung around his neck when such a situation serves no need of society." (At 388, 462 P.2d at 53.)

Until today it was my belief that this opinion represented an effort by this Court to define the continued social function (if any) and the practical and legal parameters of alimony in this the 20th century. My belief was reinforced by this Court's later decision in *Glavin v. Glavin,* 94 Idaho 813, 498 P.2d 1286 (1972), where, affirming the denial of alimony to a former wife, we summarized the rule in *Phillips:*

" * * * to the effect that alimony should *only* be awarded where the wife is unable (versus unwilling) to support herself and there is a possibility of her becoming a public burden by being placed on public assistance." At 816, 498 P.2d at 1289 (emphasis added)

With the opinion of the majority today, however, it appears that the standard declared in *Phillips* and *Glavin* has been overturned, albeit not expressly, and I know not what standard the courts of Idaho are now to utilize in determining the propriety of alimony awards.

Our result in *Phillips* was influenced considerably by certain factors concerning the correlative needs and abilities of the parties. Considering those factors, the factual similarities between the instant case and *Phillips* are compelling. Here the respondent received in excess of $26,000 as her portion of the community property divided at the time of divorce. She was awarded custody of and child support for the children of the marriage. That support was paid until the children reached majority. Respondent also was awarded alimony which was paid to the date of the consideration of this petition below. In the intervening years appellant retired and his income, like the ex-husband in *Phillips,* decreased by approximately one-half. Although the record does not indicate the basis of the original award, I would assume that at the time of the divorce the respondent was unable to support herself. She has long since educated herself and obtained gainful employment in the teaching profession and in the year immediately preceding the petition she earned $14,200 therefrom. While the respondent is now retired from the teaching profession, she has an annual retirement income of approximately $8,000. In addition, she has $30,000 in her savings account and owns real property appraised at more than $13,000. And, similar to the ex-wife in *Phillips,* her children have reached majority and she has no present responsibilities to any dependents. In sum, there is a complete absence of any evidence whatsoever in this record to indicate that the respondent is "unable (versus unwilling) to support herself," and given these facts I am of the opinion that the result herein should not differ from that reached in *Phillips. See also, Saviers v. Saviers,* 92 Idaho 117, 438 P.2d 268 (1968).

In *Phillips* and *Glavin* this Court moved toward a more realistic appreciation of the problems surrounding contemporary marital relationships, the dissolution of that relationship and the legal and practical problems resulting from that termination. Un-

fortunately, with today's decision I believe that we again retreat into the morass of legal uncertainty which has enveloped the subject of alimony in Idaho since territorial days and in most American jurisdictions since our separation from England. *See,* Kelso, "The Changing Social Setting of Alimony Law," 6 Law & Contemp.Prob., 186 (1939).

## II.

I turn now to the second basis for my dissent and disagreement with the majority's disposition of the instant matter. In my opinion the time has arrived to squarely face the questions and problems of the doctrine of alimony. If society in the past garnered any benefit from this antiquated system of private (versus public) welfare, such is either non-existent in this day and age or at the least is far outweighed by the antagonisms, social dislocations, economic burdens and judicial inefficiency which are involved and result from the perpetuation of the doctrine. *See,* Peele, "Social and Psychological Effects of the Availability and the Granting of Alimony on the Spouses," 6 Law & Contemp.Prob., 283 (1939). The rationales which were once said to justify alimony awards have long since lost their force. Of more importance perhaps is that in consideration of the rapidly evolving status of women there is serious doubt of the constitutional validity of our sexually biased alimony provisions. *See,* Griggs, "The Economics of Divorce, Alimony & Property Awards," 43 Cinn.L. Rev. 133 (1974); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Because of these changes, as more fully discussed below, I am of the opinion that alimony violates the dictates of equal protection found in the state and federal constitutions and should no longer be permitted.

It is not the general rule of this Court to invalidate laws simply because we find the reasons on which they are based wanting. Even so, this Court has seen fit to overturn long-standing rules of law where we

have found the reasons for such rules, "examined in the light of modern reality," to no longer exist. *Smith v. State,* 93 Idaho 795, 801, 473 P.2d 937, 943 (1970); *Doggett v. Boiler Engineering and Supply Co.,* 93 Idaho 888, 477 P.2d 511 (1970); *Rogers v. Yellowstone Park Co.,* 97 Idaho 14, 539 P.2d 566 (1974). This, I believe, is one of those occasions which compels our intervention. In this regard I am in agreement with the opinion of Justice Cardozo, quoted in *Smith v. State, supra:*

> "I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment." *The Nature of the Judicial Process* 150 (1921).

While I am aware that the question of continuing alimony awards would benefit from legislative examination, it was Justice Holmes who emphasized that considerations of public policy are not and never have been for determination by the legislature alone. *See,* Holmes, *The Common Law,* 35 (1881).

> "* * * We ought not to thrust upon the Legislature the sole responsibility for injustice on the ground that, 'Thus it was said in the reign of Henry IV,' nor even on the ground that any change would constitute the traditionally condemned heresy of judicial legislation." *Brown v. City of Omaha,* 183 Neb. 430 at 434, 160 N.W.2d 805, 808 (1968).

This Court has a responsibility to consider the contemporary reality of statutory law in the framework of evolving constitutional principles and where found unsupported declare it invalid.

The test of whether social welfare legislation, such as involved in the instant appeal, violates the guarantees of equal protection depends upon whether it creates a classification which has "a fair and substantial relation to the object of the legislation." *Reed v. Reed, supra,* quoting at 75–76 of 404 U.S., at 254 of 92 S.Ct.,

*Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920). *See also, Thompson v. Hagan,* 96 Idaho 19, 523 P.2d 1365 (1974); *Messmer v. Ker,* 96 Idaho 75, 524 P.2d 536 (1974); *Sterling H. Nelson and Sons, Inc. v. Bender,* 95 Idaho 813, 520 P.2d 860 (1974). In my opinion I.C. § 32–706,[1] which authorizes alimony in this state, creates two types of classifications, neither of which can be justified by this standard. The first singles out husbands whose improper conduct is said to have contributed to the divorce and permits alimony to the former wives of such marriages but denies it to all others. The second differentiates between those who may receive alimony and those who may not on the basis of sex, limiting awards only to former wives regardless of the needs of the ex-husband, the abilities of the ex-wife or her conduct in causing the divorce. Although numerous arguments have been proposed to justify alimony under this statute none is sufficient to sustain the arbitrary classifications which result therefrom.

The practice of granting alimony as an incident of divorce was imported to this country from the Ecclesiastical courts of England which prior to the Divorce Act of 1857 exercised jurisdiction over matrimonial affairs. *See,* Clark, "The Law of Domestic Relations," § 14.1 (1968); Vernier and Hurlbut, "The Historical Background of Alimony Law and Its Present Statutory Structure," 6 Law & Contemp.Prob., 197–201. In England at that time marriage was considered a sacrament and indissolvable except by private Act of Parliament.[2] Ecclesiastical law granted only divorce *a mensa et thoro* for adultery and cruelty which authorized the parties to live apart but contemplated their reconciliation. During that separation there was a legal continuance of the marriage and it was customary for the court to order the husband to pay alimony in recognition of his continued duty to support and maintain his wife. Enforcement was achieved through threat of ex-communication of a non-cooperating husband. 1 Blackstone, Commentaries 441.

At that time "the discriminatory common law scheme of marital property rights was in full bloom" in England. All property brought into the marriage, including the wife's, and all property acquired during the marriage was subject to the absolute control of the husband and few, if any, employment opportunities were available for married women. As a result, the dictates of the social economy and the real and apparent needs of the wife were of great significance in justifying and fashioning alimony awards. Clark, *supra;* Vernier and Hurlbut, *supra.*

An additional factor which influenced awards at that time was the theory of punishment for wrongdoing. Divorce *a mensa* was invariably the result of a serious marital transgression by the husband which afforded the wife the sympathies of the court. *Otway v. Otway,* 2 Phillips Ecc. 109, 161 Eng.Rep. 1092, 1093 (1913). Where divorce was the result of fault by the wife, no alimony was awarded. 1 Blackstone, Commentaries 189. Thus, it will be seen that while the award of alimony coincident with a divorce *a mensa* was designed to support a person with the continuing status of a wife, nevertheless, the

1. I.C. § 32–706 states: "Where a divorce is granted for the offense of the *husband,* including a divorce granted upon the husband's complaint, based upon separation without cohabitation for five (5) years, the court may compel *him* to provide for the maintenance of the children of the marriage, and to make such suitable allowance to the wife for her support as the court may deem just, having regard to the circumstances of the parties respectively; and the court may, from time to time, modify its orders in these respects." (emphasis added)

2. The infrequency with which absolute divorce was granted by Parliament until well into the Nineteenth Century is noted in Vernier and Hurlbut, "The Historical Background of Alimony Law and Its Present Statutory Structure," 6 Law & Contemp.Prob. at 198.

determination rested in large part upon concepts of fault and punishment.

Since the concept of alimony arose only from the right of a wife to support during the marriage, once an absolute divorce was granted the conceptual basis of alimony evaporated. Divorce *a vinculo* declared the marriage never legally existed, that the former wife was a *feme sole*. Accordingly, under Ecclesiastical law the dissolution of the marriage relationship prohibited alimony thereafter. Vernier and Hurlbut, *supra*.

In spite of its root origins in the Ecclesiastical law of England, the doctrine of alimony in this country has received very different treatment in the award of support following absolute divorce. American courts have since colonial times extended the husband's duty of support beyond the complete termination of the marriage. I find no explanation for this change in doctrine and it is therefore impossible to ascertain the purpose or policy of the decisions which have evolved. Some courts continue to assert the rationale of punishment, some cite the English experience but then continue support beyond the formal and complete termination of the marriage, and some explain it only in terms of disparities between the man and the woman's social and economic opportunities. In all, this wavering of views on the purpose of alimony in American jurisdictions looks suspiciously like mere groping on the part of the courts and is perhaps the initial indication of the questionable rationale said to legitimate the doctrine.

On the other end of the spectrum the complete departure from all reason and logic which has been indulged in is perhaps best demonstrated by those courts such as *Jones v. Jones*, 48 Wash.2d 862, 296 P.2d 1010 (1956), granting decrees of annulment holding in effect that the marriage relationship had never legally existed and yet in the same breath awarding alimony. *See also*, 54 A.L.R.2d 1410. Perhaps the ultimate indignity that might be inflicted was the award of alimony to a former "wife," a person born male but denominated a transsexual having undergone surgical alteration. *See*, 1 Family Law Rep. 2285 (March 11, 1975). Cf. *Corbett v. Corbett*, 2 W.L.R. 1306, All E.R. 33 (P.D.A.1970). One is, of course, inclined to speculate whether a previous award of alimony would be modified on the basis of a permanent and material change in circumstances if the ex-wife underwent an operation purporting to transfer her into the status of maledom. Would a court allow a claim for alimony to be defended on the basis that the wife could at her option be transformed into a male and therefore eliminate any disparate social or economic differences which operate to her detriment?

The law of Idaho is no exception to this obfuscation of purpose. Historically, since 1875 punishment has been the primary rationale for the award of alimony in this state. Our present law, I.C. § 32–706, still predicates awards on an offense of the husband. In the earliest alimony opinions of this Court fault was the dominant concern, although other considerations were noted. *Enders v. Enders*, 36 Idaho 481, 211 P. 549 (1922); *Humbird v. Humbird*, 42 Idaho 29, 243 P. 827 (1926); *Smiley v. Smiley*, 46 Idaho 588, 269 P. 589 (1928); *Hampshire v. Hampshire*, 70 Idaho 522, 223 P.2d 950 (1950).[3] As recently as 1954 in *Jollifee v. Jollifee*, 76 Idaho 95, 101, 278 P.2d 200, 203, it was stated "evidence as to fault or wrongdoing is the sine qua non of a just and equitable * * * award of alimony."

3. Among those early cases was *Day v. Day*, 15 Idaho 107, 96 P. 431 (1908). There, the parties were married on January 24, 1905, and as described therein "it appears from the record that the fight began upon the day following the marriage and continued with unabated energy until April 5th of the same year." The Court therein not to be daunted in its search for a rationale justifying the award of alimony fell upon the fact that since her ex-husband had supported her before the marriage, he might just as well be required to support her after the marriage.

Despite this authority other criteria have largely displaced punishment as the deciding factor in alimony awards. As early as 1945, I.C. § 32–706 was amended to sanction alimony in divorces "granted upon the husband's complaint, based upon separation without cohabitation for five years." Ch. 125, § 2 (1945) Idaho Sess.Laws, p. 191. Oddly enough this exception preceded the decision in Jollifee by nine years but somehow escaped the Court's pronouncement in that case. While we are without record of the legislature's intention in making this amendment, it is clear that from that time punishment for fault ceased to be the *raison d'etre* for alimony in Idaho. Since then the legislature has eliminated fault from consideration in disposing of community property upon divorce. *See* I.C. § 32–712 (Ch. 63, § 1 [1965] Idaho Sess.Laws, p. 98), and from the causes of divorce by instituting "irreconcilable differences" as a legal ground of dissolving a marriage. I.C. § 32–603, 616 (Ch. 20 §§ 1 and 2 [1971] Idaho Sess.Laws, p. 33). In *Ripatti v. Ripatti*, 94 Idaho 581, 583, 494 P.2d 1025 (1972), this latter provision was described by this Court as the embodiment of no-fault divorce. Although we have yet to address whether alimony may be awarded in a no-fault divorce, it is abundantly clear that these legislatively initiated departures from the historical concern for fault in the law of domestic relations indicate a changed rationale for alimony in this state. Veiled hints to the contrary, punishment as a dispositive factor has all but been replaced by other more dominant concerns.[4] It was not until 1957 that the judicial branch of government recognized this fact in the case of *Good v. Good*, 79 Idaho 119, 311 P.2d 756 (1957), where the Court embraced an entirely new rationale for alimony awards. There, the issue was whether or not a wife whose extreme cruelty was the basis for the divorce could receive alimony notwithstanding I.C. § 32–706. Despite the language of that statute predicat-ing alimony upon divorce granted for the husband's offense, the Court concluded that an award of alimony should be upheld where "the wife's fault, though sufficient to justify a divorce to the husband, *is not so grievous*" (emphasis added) (at 130, 311 P.2d at 763). *See also, Meredith v. Meredith*, 91 Idaho 898, 434 P.2d 116 (1967); *McNett v. McNett*, 95 Idaho 59, 501 P.2d 1059 (1972).

The Court said in *Good*:

"Courts have quite universally recognized the inequity and injustice of turning a wife out destitute to become an object of charity in cases where the husband, who obtains the divorce, is amply able to provide for her support, and where she has no means or ability to provide for herself, solely on the ground that she has by her conduct provided the grounds for divorce." (citation omitted) 79 Idaho at 125, 311 P.2d at 760.

That radical departure from the traditional rule that the wife's fault barred an award of alimony, *see Enders v. Enders, supra; Fisher v. Fisher*, 84 Idaho 303, 308, 371 P.2d 847 (1962); 34 A.L.R.2d 313, 321 (1954), was said to be based upon an inherent common law authority derived from equity jurisdiction. However, as pointed out by the dissenting opinion of Chief Justice Keeton and sustained by Clark, *supra*, at 421, reliance upon the "inherent jurisdiction of equity courts" is based upon a mistake in the reading of English legal history. Nevertheless, with *Good* came the advent of what may be described as the "rule of social necessity" which loosely stated examines the supposed "correlative needs and abilities of the parties" in judging the propriety of spousal support. *See McNett v. McNett, supra; Wyatt v. Wyatt*, 95 Idaho 391, 509 P.2d 1312 (1973).

That perspective was explained in *Good* as necessary to protect the interest of society in not having a former wife left destitute by the divorce. Yet, how far we have

---

4. Cf. *McNett v. McNett*, 95 Idaho 59, 501 P.2d 1059 (1972), where an alimony award was upheld despite the fact that both spouses were granted divorce.

moved from this narrow concern for the interest of society. Somehow the legitimate interest of society in preventing destitute divorcees (unable as contrasted to unwilling to work) from being cast upon the relief rolls has been perverted into an instrument to level economic disparities, both real and imagined, between two people in which there exists no legal relationship. The focus of judicial inquiry is no longer whether the former wife is about to become the object of public charity. Without guidance from this Court and at the sole whim of a trial judge, bound by no ascertainable standard, eternal peonage can be imposed upon a man solely because he was once called a husband.

Since *Good*, "social necessity" has blossomed into a judicial calculus of many and diverse factors and variables. Among the factors and variables which have been discussed are: 1) the fault of the husband; 2) the extent of the wife's needs and her ability to meet those needs; 3) the amount of the community property award; 4) the existence of minor children; 5) the wife's health, age and vocational skills; 6) eligibility for social security; 7) duration of the marriage; and 8) remarriage of either spouse. *See, Simplot v. Simplot*, 96 Idaho 239, 246-47, 526 P.2d 844 (1974); *Speer v. Quinlan*, 96 Idaho 119, 132, 525 P.2d 314 (1974); *Evans v. Evans*, 92 Idaho 911, 920, 453 P.2d 560 (1969); *Saviers v. Saviers, supra; Loveland v. Loveland*, 91 Idaho 400, 403, 422 P.2d 67 (1967); *Losee v. Losee*, 91 Idaho 77, 79, 415 P.2d 720 (1966); *Despain v. Despain*, 78 Idaho 185, 190, 300 P.2d 500 (1956); *Nichols v. Nichols*, 84 Idaho 379, 383, 372 P.2d 758 (1962); *McHan v. McHan*, 59 Idaho 496, 506, 84 P.2d 984 (1938). *See also, MacDonald v. MacDonald*, 120 Utah 573, 236 P.2d 1066, 1070 (1951); *Clark, supra*, at 442.

To substantiate this proliferation of criteria a host of arguments have been foisted upon courts to justify alimony. Professor Homer H. Clark, Jr., in his treatise, *The Law of Domestic Relations,* discusses five rationales which courts have relied upon in justification for alimony awards.

"[A]limony acts indirectly to protect the children of divorce, it prevents the wife from becoming a financial burden to the community, it eases the hardship of transition from marriage to single status, it compensates the wife for services rendered, and to some extent it gives tangible form to moral judgments about the relative fault of the spouses." at 442.

In addition, it has been suggested that alimony serves the vital function of compensating women for past and present economic and social discrimination. *Griggs, supra*, at 149. While at one time or another in the past I might have joined in defending alimony for one or more of these reasons, I now believe that by contemporary standards they no longer provide a reasonable basis or justification for such awards.

I deem it clear that while punishment is of diminishing importance in deciding alimony questions in Idaho, nevertheless, the doctrine of alimony continues to some extent to be infected with the fault-punishment concept. By the institution of no-fault divorce we have at least begun to understand that facile moral judgments serve no legitimate purpose in an area as complex as the marital relationship between man and woman and the dissolution thereof. To pontificate that the scales of justice are capable of objectively identifying and weighing the origins of marital discord and relative degrees of fault between the parties and then awarding a penalty for such is nothing short of ludicrous. At the least it can do no more than aggravate and prolong the trauma of the occasion of divorce and the residual and resulting bitterness of the parties thereafter. In purporting to punish the fault of the husband but not that of the wife it further raises serious questions of equal protection. *See, Murphy v. Murphy*, (Ga.) 42 U. S. Law .Week, 2393; *Wiegand v. Wiegand*, 226 Pa.Super. 278, 310 A.2d 426 (1973).

Another purported argument in justification of the continuance of alimony is the needs of the minor children of the parties. Depending on what court is speaking and in what case it is variously argued that alimony constitutes a part of a total package of financial protection for the minor children or otherwise that there is some social importance in freeing the divorced mother from work to care for the children. Both suggestions, of course, beg the question in cases like the one at bar.

This Court has in my judgment made clear that child support is for the benefit of the children and only the children since, although a mother may benefit indirectly from child support, she is not the real party in interest. *Kirkwood v. Kirkwood*, 83 Idaho 444, 363 P.2d 1016 (1961); *Alber v. Alber*, 93 Idaho 755, 758, 472 P.2d 321 (1970). I continue to believe that alimony and child support have distinct and different conceptual basis and should be treated as such at all times.

The other part of the child support-alimony thesis is equally erroneous, albeit it was voiced in *Nielsen v. Nielsen*, 87 Idaho 578, 394 P.2d 625 (1964). The underlying basis for that thesis is a belief that children from the homes of working parents suffer from neglect and are potential future burdens on society. No evidence of the correctness of that hypothesis is ever cited nor do I believe such evidence exists. It further ignores the realities of modern day life. Approximately one out of every three marriages end in divorce. In 1972, 41.5 percent of the married women living with their husbands (many with children) were employed and contributed to family support. *See*, Statistical Abstract, 222 (1973). I would believe that an even greater percentage are similarly employed today. Some 30 million women presently employed comprise 45.7 percent of the total labor force in the United States. Women today control more than one-half of the national wealth. *See*, Levittan, "Alimony —A Reformation," 7 J.Fam.L. 51, 56 (1967); Griggs, *supra*, at 146; "Women's

Work," 87 *Newsweek*, No. 19, 97 (May 10, 1976). Such attempted rationale further ignores changing concepts in the law of child custody awards as between parents. *See, Tomlinson v. Tomlinson*, 93 Idaho 42, 454 P.2d 756 (1969); *Bryant v. Bryant*, 92 Idaho 76, 437 P.2d 29 (1968); *Parks v. Parks*, 91 Idaho 420, 422 P.2d 618 (1967).

Another rationale for alimony has been that it assuages to some extent the potential trauma of change in the social and financial status of the wife on the occasion of divorce. *See*, Peele, *supra*, at 291. That reasoning assumes that such disruptions only accrue to the wife and that is clearly not the case. In most divorces, particularly those involving minor children, the wife is awarded the family home and furnishings together with child support. In many cases the husband literally faces bankruptcy and is deprived not only of his marital status but also the greater part of his previous relationship with his children. A good marriage is greater than the sum of its parts and both parties thereto suffer from a division. Alimony only exacerbates the problems by forestalling the recovery of separate identities and rekindling the anguish of the divorce with each periodic payment of alimony. Following a divorce a woman may remarry and usually better her situation through the injection of income from her new husband. On the other hand a divorced man paying alimony and child support is almost automatically barred from remarriage unless willing to risk continued marital discord over which woman he owes more financial loyalty, the one to whom he is married and the law enjoins him to support, I.C. § 32–901, or the one to whom he is no longer married but which a judge has required him to support. At the very least he faces financial stress in trying to support two households.

A further rationale is that the wife is entitled to alimony as just compensation for her faithful contribution to the marriage. As in the question of marital fault

there is a complete lack of objectivity in forming such facile moral judgment.

The wife may have made the marriage and the household a living hell for her husband and children. She may as in *MacDonald v. MacDonald, supra,* be a chronic alcoholic who precipitated the break up of the marriage and the family. On the other hand she may have been faithful, loving, tolerant, courteous, kind, obedient, thrifty, industrious and God fearing. We can hardly depend on the parties for an objective evaluation of the wife's contribution to a marriage and any attempted outside evaluation can be nothing but farcical. As John Steinbeck observed in "Cannery Row", people may be very different depending upon the peephole through which they are viewed. There is too little, if any, objective evidence for courts to blandly announce that alimony should be awarded to women because everyone knows that they contribute faithfully to the well being and stability of the marriage. Beatification and canonization should be granted on an individual rather than a class basis and in any event only by an ecclesiastical court.

In non-community property states problems may exist. But in community property states where non-income producing spouses are protected, community property division is the logical, rational and sole method of dividing the assets of the former partnership. In 1974 our legislature amended I.C. § 32–912 to allow equal management of community property as between man and wife and the wife is now permitted to bind community assets through her independent contracts. If compensation there need be, community property laws adequately and fairly fulfill this function without augmentation from the law of alimony.

I turn now to the final rationale advanced for the award of alimony to women, i. e., the economic disparity between men and women in our society. I am aware that as a result of overt discrimination or the mere existence of the male dominated culture such disparity to some extent continues to exist. No longer do economic and social differences between men and women in our society provide sufficient basis for the continuation of the award of alimony.[5] As earlier indicated, substantial numbers of women are able to find and hold employment, make investments and accumulate wealth. The courts have been the primary institution contributing most to the expansion and achievement of equal rights as between the sexes. We have recognized the right of a wife to hold and manage her separate property independent from her husband's control, to enter into contracts with respect to such property, I.C. §§ 32–903, 904, to contract with her own husband and to sue him for his torts. *Lorang v. Hays,* 69 Idaho 440, 209 P.2d 733 (1949). She may sue and be sued on matters relating to her separate property and she may bind, sell, convey or encumber community property without the consent of her husband. I.C. § 32–912. In *Williams v. Paxton,* 97 Idaho 155, 559 P.2d 1123 (1976), we have eliminated one of the few remaining vestiges of dissimilar treatment between husbands and wives declaring that married women have "the same contractual rights and responsibilities with respect to their separate property as those enjoyed by married men." In *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), the Supreme Court of the

---

5. This is not the case like that addressed in *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) involving a law designed to cushion the financial impact disproportionately imposed upon women in our society and thus "rectify the effects of past discrimination against women" (at 355, 94 S.Ct. at 1737). Rather, this statute more closely approaches that addressed in *Fron-*

*tiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) whose sole objective was "administrative convenience" founded upon an assumption that wives in our society are frequently dependent upon their husbands, while husbands are less often dependent upon their wives (688–89, 93 S.Ct. 1764).

United States held to be unconstitutional an Idaho statute preferring male relatives over female relatives of a decedent's estate. It appears that all laws granting differing treatment of the rights and responsibilities of men and women, be they married or unmarried, are now subject to constitutional scrutiny. *See also, Suter v. Suter,* 97 Idaho 461, 546 P.2d 1169 (1976). Parenthetically it should be noted that Titles VI and VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d and 2000e et seq., enhance the elimination of sexual discrimination in employment and are therefore directly pertinent to the questions of alimony and economic considerations involved therein.

There is not yet absolute economic and social parity between men and women. That does not diminish the significance of the changes which have taken place nor does it alter the clear conclusion that the economic disparities which once served as a rationalization for alimony awards to women have been substantially eroded and no longer provide justification. Obviously, times have changed but the law of alimony has not.

We now have in this state a doctrine created by statute to serve one purpose and molded through legislative erosion and judicial fiat to serve a multitude of purposes. It has no justification in legal history nor any reasoned explanation for its existence. It is assumed to fulfill a necessary function of social economy, but that "necessity" appears suspect at best. As far as I can glean from the law of this jurisdiction, and giving due deference to arguments from other jurisdictions, alimony exists because it has always existed and this alone appears to be its sole justification. Such bears no reasonable relationship to the objective the statute is said to serve and consequently results in an impermissible classification in violation of the equal protection of law guarantees of the Idaho and United States Constitutions.

It is said that there is nothing so dangerous to the status quo as an idea whose time has come. More dangerous yet is the continuance of an idea whose time has past. In voiding I.C. § 32–706 we would not be alone in holding that permanent alimony no longer has any place as a legal concept or doctrine in contemporary society. We would be joining the states of Texas, Delaware, Pennsylvania and North Carolina. See Vernon's, Annotated Civil Statutes (Tex.) § 4683 (1960); *Beres v. Beres,* 2 Storey 133, 52 Del. 133, 154 A.2d 384 (1959); *Hooks v. Hooks,* 123 Pa.Super. 507, 187 A. 245 (1936); *Rayfield v. Rayfield,* 242 N.C. 691, 89 S.E.2d 399 (1955). In each of those states alternative provisions have been made to insure a fair and financial accounting upon divorce and to protect the interests of society in preventing the creation of charity cases. Nevertheless, the overriding concern in each appears to be the achievement of a complete dissolution of all duties and responsibilities upon divorce. With that objective I am in complete agreement.

Texas is perhaps the most interesting example since it has never recognized permanent alimony and yet has somehow been able to avoid having a disproportionate number of charity dependent divorcees on its welfare rolls and because Texas, like Idaho, is a community property jurisdiction. Historically, from earliest times alimony has been denied in Texas and it is now regarded as void against public policy. *Pape v. Pape,* 13 Tex.Civ.App. 99, 35 S.W. 479 (1896); *Boyd v. Boyd,* 22 Tex.Civ. App. 200, 54 S.W. 380 (1899); *Francis v. Francis,* 412 S.W.2d 29 (Tex.1967). Property division is recognized as the substitute for alimony, *Bond v. Bond,* 41 Tex.Civ. App. 129, 90 S.W. 1128 (1905) and the Texas courts are vested with wide discretionary power to divide property in such way as will seem "right, just and proper." *Baize v. Baize,* 460 S.W.2d 255, 256 (Tex. Civ.App.1970). A host of factors may be utilized in determining the division of the property and those factors to some extent parallel factors used by other courts in al-

location of alimony. *Miller v. Miller*, 463 S.W.2d 477 (Tex.Civ.App.1971).

The method of handling the financial aspects of divorce in Texas closely parallels that suggested by those who propose application of the law of partnership to the financial aspects of divorce. *See*, e. g., Daggett, "Division of Property upon Dissolution of Marriage", 6 Law & Contemp. Prob., 225, 229 (1939); Griggs, "The Economics of Divorce, Alimony and Property Awards," 43 Cinn.Law Rev. 133, 152 (1974); Freeman, "Should Spousal Support be Abolished?," 48 Bar Bulletin, 236, 240 (1973). From a financial standpoint, the dissolution of a marriage should be no different in logic and law than the dissolution of any other partnership. Since the real wealth of any good marriage results from the joint contribution of the spousal partners, each should be entitled to their fair share of the assets at dissolution. While in the case of a marital partnership, dissolution may result in an equal division of the community assets such is not an absolute necessity and in the proper circumstances there is nothing to prevent the wife being awarded the lion's share or indeed all of the assets of the marriage partnership. I.C. § 32–712.

In pursuit of a solution to the continuing judicial headaches of alimony some states have moved in the direction of term alimony. Such a concept is no less illogical, impractical and without societal foundation or necessity in the Twentieth Century than permanent alimony. While I agree with the object of this doctrine insofar as it is designed to sever the duties of support at an early, finite date, it nonetheless perpetuates the idea that one spouse has an obligation to care for the needs of the other beyond dissolution of the marriage as an amorous and financial enterprise. *See*, Clark, "Divorce Policy and Divorce Reform," 42 Univ.Colo.L.Rev. 403 (1971). In this respect it has the danger of fostering an entirely new but still irrational doctrine, different in name but not in substance from its historic predecessor. I therefore am of

the opinion that the previous discussion relating to permanent alimony is equally applicable to term alimony.

In my judgment the time has long since passed when the state and its judiciary should cease its unwarranted, unnecessary, irrational intrusion into the lives of its citizens simply because at one time they occupied a marital status.

In the absence of other factors, we would not countenance the demand of an ex-employee for lifetime support from his ex-employer merely because of the termination of the previously existent employment relationship. How ludicrous would we consider a demand for lifetime support for one who once engaged in a dissolved partnership, the assets of which have been distributed. We would undoubtedly laugh out of court an able bodied person past the age of majority who demanded a judicially mandated lifetime support from another person on the sole basis that a parent-minor child relationship had once existed. I deem it obvious that in all those instances regardless of a plaintive plea that "I gave him (or her) the best years of my life," we would nevertheless rule that when the legal relationship terminated and the accounts were settled each person was required to go his own way freed of liability to the other. In each of these cases we would certainly refuse to institute a system of lifetime peonage and bondage and I doubt not that in the event we complied with such requests we would be speedily overruled by higher authority on constitutional grounds.

Why then do we tolerate, continue and judicially mandate a system of lifetime serfdom upon the dissolution of a marriage relationship? I deem there to be no answer to that question except "that's the way we've always done it." The law of domestic relations requires more than placebos and patent medicines. It is long past time for judicial surgery to excise the doctrine of alimony from the body of the law of domestic relations.

SCOGGIN, D. J. (Ret.), concurs.