CAROLYN BRONSEN, APPELLANT, V. DAWES COUNTY, NEBRASKA, A NEBRASKA POLITICAL SUBDIVISION, AND FUR TRADE DAYS, INC., A NEBRASKA CORPORATION, APPELLEES.

704 N.W.2d 273

Filed October 4, 2005. No. A-04-237.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, for appellant.

Michael J. Javoronok, of Michael J. Javoronok Law Firm, for appellee Dawes County.

Neleigh N. Korth and Tim W. Thompson, of Kelley, Scritsmier & Byrne, P.C., for appellee Fur Trade Days, Inc.

INBODY, Chief Judge, and CARLSON and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Carolyn Bronsen filed a claim in the district court for Dawes County, Nebraska, against Dawes County (the County) and Fur Trade Days, Inc. (FTD), seeking damages for injuries she sustained after tripping and falling in a depression or hole in the lawn of the Dawes County courthouse while attending the Fur Trade Days celebration in Chadron, Nebraska. The district court granted motions for summary judgment filed by the County and FTD, finding that both the County and FTD were immune from liability pursuant to the Nebraska Recreational Liability Act (RLA), Neb. Rev. Stat. §§ 37-729 to 37-736 (Reissue 2004). For the reasons stated herein, we affirm.

## BACKGROUND

Bronsen's injuries occurred during the Fur Trade Days celebration in Chadron in July 2002. The celebration is arranged by FTD, a not-for-profit corporation organized under the laws of the State of Nebraska. The celebration takes place in Chadron each year on the second weekend of July. Fur Trade Days is a historical celebration of traders, "buckskinners," and Native Americans. The weekend is filled with a variety of different activities, including those at the "buckskinners' camp," where the public can view tepees, oldtime shelters, and furs being sold by traders. Events and activities are held on the Dawes County courthouse lawn, including a "buffalo burger" barbecue, a historical fur trade flag ceremony involving a dramatic presentation of the flags of the various entities involved in this country's fur trade, a flea market, and performances by bluegrass bands, Native American dancers, and other entertainers. Fur Trade Days also includes a parade, softball games throughout the weekend, and many other activities.

The summary judgment record shows that at the time of Fur Trade Days in 2002, Bronsen, a resident of Utah, was visiting her parents in Chadron. Bronsen had not attended Fur Trade Days or visited the courthouse lawn prior to the July 2002 celebration. On July 13, Bronsen and her family watched the parade, walked through the flea market, and purchased buffalo burgers

and beverages for lunch. Bronsen and her family sat at a picnic table on the courthouse lawn to eat their lunch, after which they planned to view the "[Native American] powwow." After lunch, Bronsen and her father went across the street to get bowls of homemade ice cream for the family to eat. Bronsen and her family visited while they ate the ice cream. As she walked across the courthouse lawn prior to her accident, Bronsen was able to feel that the lawn was uneven. Bronsen was also aware that her father had stepped in a hole in the courthouse lawn before the family first arrived at the picnic table. When Bronsen and her family were done eating, Bronsen picked up some paper plates and bowls that had blown off the picnic table, intending to throw them away in a nearby trash can. On her way to the trash can, Bronsen stepped into a hole or uneven area and fell, breaking her ankle. Since the accident, Bronsen has had several surgeries to repair the break. At the time of her deposition in November 2003, Bronsen still had pain in her ankle. Bronsen also continued to receive medical treatment in connection with the accident.

We note that although filed after the date when new rules of pleading took effect in Nebraska, Bronsen's pleadings use captions and terms from the old rules of pleading. Bronsen captioned her complaint and subsequent amended complaint with the terms "petition" and "amended petition" and used the term "cause of action" rather than the term "claim." Throughout this opinion, we will refer to Bronsen's operative "petition" (her amended petition) as the "complaint" and will refer to what Bronsen has titled her "cause of action" as her "claim."

Bronsen filed her operative complaint on May 12, 2003, setting forth a negligence claim against both the County and FTD. Specifically, Bronsen alleged that on July 13, 2002, she suffered personal injuries when she fell after stepping in a hole in the courthouse lawn while attending Fur Trade Days. Bronsen alleged that her fall was proximately caused by the negligence of the County in that it failed to (1) inspect the courthouse lawn for dangerous conditions, (2) maintain the lawn in a manner suitable for pedestrian traffic, (3) repair holes as they appeared in the lawn, (4) warn pedestrians of the existence of the hole, or (5) restrict traffic in the area of the hole so as to prevent pedestrians from falling there. Bronsen alleged that her fall was also

proximately caused by the negligence of FTD as the occupier of the courthouse lawn on July 13. Bronsen alleged that FTD was negligent in the same respects as was the County. Bronsen further alleged that her injuries required treatment from health care providers, that she incurred medical expenses exceeding $1,000, and that she would continue to incur future medical expenses. Bronsen also sought recovery for disability, pain and suffering, and lost income, both past and future. Finally, Bronsen alleged that she had filed a tort claim on October 21 with the Dawes County clerk pursuant to Nebraska's Political Subdivisions Tort Claims Act, that more than 6 months had passed without response, and that she had withdrawn her claim on April 23, 2003. Bronsen sought judgment for her special damages in an amount to be proved at trial and for such general damages as were allowable by law.

In its answer, the County denied that any defect existed in the lawn at the county courthouse other than the inherent uneven condition of the lawn itself due to the natural settling and rising of the soil. The County admitted that Bronsen fell on the lawn of the courthouse but alleged that Bronsen's fall was proximately caused by her own negligence. The County also contended that Bronsen's injuries "may not have been as she has alleged" and that Bronsen may have failed to mitigate her damages. The County alleged that it may be immune from liability because the premises were being used for recreational purposes as defined by § 37-729. The County also asserted that it did not have sufficient funds to "allocate as [Bronsen] has suggested." FTD filed an answer and subsequently an amended answer, making similar allegations and denials to those made by the County.

The County and FTD filed motions for summary judgment, which were heard by the district court on December 22, 2003. In addition to the evidence set forth above, the record at the summary judgment hearing included deposition testimony from Carol Connell, a part-time custodian and groundskeeper for the County. Connell's duties at the courthouse include minor interior maintenance, painting, daily cleaning, snow removal in the winter, and lawn maintenance in the summer. Connell mows, waters, and trims shrubs. Connell sows grass seed in areas where trees have been removed and fills holes in the courthouse lawn in the

spring and summer. Connell testified that she had filled the hole where Bronsen fell with dirt sometime prior to the 2002 Fur Trade Days celebration but that the dirt used to fill the hole had apparently settled. Connell testified that she probably did not put enough dirt in the hole and testified that the dirt "washes with the hoses." Connell testified that she thought her maintenance of the lawn and procedure for repairing uneven spots were reasonable. Connell had never heard of any other individual complaining of holes or dents in the courthouse lawn.

George Klein, one of the cochairs for the 2002 Fur Trade Days celebration, also testified by deposition. Klein was asked how FTD ensured that the land it used for Fur Trade Days activities was safe. Klein responded that FTD relied on the County's maintenance of the courthouse grounds. Klein did not direct a specific inquiry to the County about its maintenance activities prior to the 2002 celebration, and he testified that no one from FTD inspected the courthouse lawn. Klein testified that in terms of making sure the courthouse lawn was safe for Fur Trade Days activities, FTD expected the County to perform its "normal maintenance" and expected that the County would take measures to fill any holes "big enough to put a foot in" if the County were aware of such holes.

The record also includes an affidavit in which Klein provided information about FTD and his knowledge of the 2002 celebration. In his affidavit, Klein stated that he was unaware of FTD's ever paying a fee to the County for the use of the courthouse lawn and that at no time was FTD requested to perform any work or repairs on the lawn. Klein stated that at no point before or during the 2002 celebration (prior to Bronsen's accident) did he see or otherwise become aware of the hole that allegedly caused Bronsen's fall. Based on Klein's experience with and observations of the courthouse lawn, he did not believe it to be a dangerous place for hosting a public event. Klein stated that FTD does not charge the celebration attendees any sort of admission fee to enter the courthouse lawn. According to Klein, the only money paid by attendees is to purchase food or goods sold by various vendors for the event, and attendees are in no way required to purchase any of these items. Klein stated that attend - ees could simply sit at any of the various picnic tables on the

lawn and enjoy the free entertainment and could even bring their own food and seating. Klein was unaware of any previous injuries sustained on the courthouse lawn during the "10 years or so" that FTD had held its Fur Trade Days activities at that location. Klein stated that as cochair for the 2002 celebration, he received no reports of holes located on the lawn and was unaware of any other individual associated with FTD's being aware of any holes on the courthouse lawn.

The district court entered an order on February 4, 2004, granting both motions for summary judgment. The court found that it was clear Bronsen "was using [the courthouse lawn] for picnicking, viewing historical events or recreations (pow wow) or otherwise using the land for purposes of the user" and that those uses would qualify as recreational purposes under § 37-729(3). The court found that the facts adduced showed that FTD qualified as an owner as defined by § 37-729(2), in that it was an occupant or person in control of the premises. The court found that the evidence showed that Bronsen was allowed to use the courthouse lawn without charge. The court stated that FTD was thus immune from liability unless there was a willful or malicious failure on its part. The court found that FTD had no knowledge of the hole and did not create the hole and that thus, there was no willful or malicious action on the part of FTD.

The district court concluded that the County's actions would also place it within the protection of the RLA. The court stated that in order to establish liability on the part of the County, Bronsen was likewise required to show that its actions would amount to a willful or malicious failure. The court noted evidence showing that Connell, a county employee, had previously filled the hole but that the fill material had apparently settled. It further noted that there was no evidence that Connell knew this "condition" (the settling of the fill material) existed at the time of the 2002 Fur Trade Days. The court also noted deposition testimony from Bronsen that she knew a hole or dip existed at the location where she fell prior to her accident. The court concluded that there was no willful or malicious action on the part of the County.

The district court found no genuine issue as to any material fact and concluded that the County and FTD were entitled to

judgment as a matter of law. Accordingly, the court granted the motions for summary judgment. Bronsen subsequently perfected her appeal to this court.

## ASSIGNMENT OF ERROR

Bronsen asserts that the district court erred in sustaining the County's and FTD's motions for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005); *Range v. Abbott Sports Complex*, 269 Neb. 281, 691 N.W.2d 525 (2005). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Range v. Abbott Sports Complex, supra.*

Statutory interpretation presents a question of law. *Rauscher v. City of Lincoln*, 269 Neb. 267, 691 N.W.2d 844 (2005). When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below. *Id.*

## ANALYSIS

Bronsen asserts that the district court erred in sustaining the County's and FTD's motions for summary judgment. In sustaining the motions and dismissing Bronsen's complaint, the district court determined that both the County and FTD qualified as "owners" under the RLA and that Bronsen's activities at the time of her accident constituted "recreational purposes" under the RLA. The court also found that Bronsen was not charged a fee for her use of the courthouse lawn and that there was no willful or malicious action on the part of the County or FTD. Bronsen does not dispute the court's finding that both the County and FTD qualified as owners or its finding that she was not charged

a fee for her use of the property. Bronsen does dispute the premise that the courthouse lawn is the type of property that ought to be protected under the RLA, as well as the court's finding that her activities at the time of her accident amounted to "recreational purposes" under the act. Bronsen also argues that the County's conduct was willful or malicious. We address each of these arguments separately below.

*Relevant Provisions of RLA.*

As a background for our discussion of Bronsen's arguments, we first set forth the relevant provisions of the RLA. Pursuant to § 37-731, "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes." Exceptions are provided for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity and for injury suffered when the landowner charges the person or persons who enter or go on the land. § 37-734. The purpose of the act "is to encourage owners of land to make available to the public land and water areas for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon." § 37-730. Pursuant to § 37-729(2), an "[o]wner" includes a "tenant, lessee, occupant, or person in control of the premises." "Recreational purposes" are defined as including, but not being limited to, "any one or any combination of the following: Hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, waterskiing, winter sports, and visiting, viewing, or enjoying historical, archaeological, scenic, or scientific sites, or otherwise using land for purposes of the user." § 37-729(3). Finally, "[c]harge" is defined as meaning "the amount of money asked in return for an invitation to enter or go upon the land." § 37-729(4).

*Application of RLA.*

Bronsen argues that the RLA should not apply to public landowners whose land was not opened in reliance on the RLA.

Bronsen further argues that because in the present case there is no evidence indicating whether the courthouse lawn was opened to the public in response to the RLA, the district court's order granting the summary judgment motions should be reversed and this matter should be remanded for a finding of whether the County should enjoy the benefit of the RLA when it apparently offers no "*quid pro quo*" to the public in exchange for immunity from liability. Brief for appellant at 14. Bronsen's arguments are based in part on the purpose of the RLA as stated in § 37-730, which is set forth above.

Among comparable jurisdictions, there is a division of authority as to whether recreational use statutes are available to immunize public bodies. The following remarks are useful in understanding the controversy and the arguments presented by Bronsen:

> In a number of cases, the statutes have been applicable in cases where governmental entities or other public bodies owned the property, but other holdings are to the contrary, sometimes on the basis that a governmental entity is not a "person" within the meaning of a state recreational use statute which applies to "persons."

62 Am. Jur. 2d *Premises Liability* § 131 at 507-08 (2005).

> It has been reasoned that since the sole purpose of a recreational use statute is to induce property owners, who might otherwise be reluctant to do so for fear of liability, to permit persons to come upon their property to pursue the activities specified in the statute, such a statute does not provide immunity to a governmental agency already operating and maintaining a supervised facility for use by the public. Furthermore, since public parks are used not only for the "recreational" purposes listed in the statute, application of such a statute to require a county to observe different standards of care with respect to various park visitors, depending upon the nature of the activity for which they entered the premises, would foster an unreasonable result. Hence, the statute did not provide immunity to a county in the maintenance of a public park that was routinely patrolled, maintained, and supervised by the county and that was held open to the public for pursuit of some

activities other than those specified in the statute. Other courts, however, have rejected the argument that the application of the statute to public parks defeated a public policy in favor of providing the public with safe facilities, and that the statutory purpose of encouraging the opening of land to public recreational use did not apply to the state. Nor has the argument that immunizing governmental bodies is not justified because it does not result in an increase in the amount of land available for recreational activities been accepted by federal courts construing the Federal Tort Claims Act, partly on the ground that federal regulations allow certain officials to close or restrict the use of forest or park areas and roads.

*Id.*, § 132 at 508-09.

While Bronsen cites case law from another jurisdiction in support of her argument in favor of a quid pro quo requirement, the case law relied on by Bronsen is distinguishable from the present case, and after reviewing the relevant Nebraska case law, we decline Bronsen's invitation to impose such a requirement. While the Nebraska Legislature has not explicitly stated whether an owner of land includes governmental entities as well as private parties, the Nebraska Supreme Court has expressly held on four occasions that the RLA applies to governmental and private landowners alike. See, *Thies v. City of Omaha*, 225 Neb. 817, 408 N.W.2d 306 (1987); *Gallagher v. Omaha Public Power Dist.*, 225 Neb. 354, 405 N.W.2d 571 (1987); *Bailey v. City of North Platte*, 218 Neb. 810, 359 N.W.2d 766 (1984); *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981). On other occasions, the Nebraska Supreme Court, while deciding whether governmental entities were entitled to immunity on some other ground, has tacitly accepted that they could be owners under the above line of cases. See, *Veskerna v. City of West Point*, 254 Neb. 540, 578 N.W.2d 25 (1998) (concluding city street could not be temporarily converted to recreational area for purpose of limiting city's liability under RLA for plaintiff's injury sustained at automobile show); *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 544 N.W.2d 502 (1996) (concluding school district was not immune under RLA from liability for football player's injury because football clinic was not open to public without charge),

*abrogated on other grounds, Heins v. Webster County,* 250 Neb. 750, 552 N.W.2d 51; *Garreans v. City of Omaha,* 216 Neb. 487, 345 N.W.2d 309 (1984) (concluding city was protected under RLA when plaintiffs did not pay charge to enter park and city was not guilty of willful or wanton negligence). See, also, *Teters v. Scottsbluff Public Schools,* 5 Neb. App. 867, 884, 567 N.W.2d 314, 327 (1997) (holding that school district was "owner" of land under RLA as "an occupant or a person in control of" recreational camp for weekend but was not immune from liability because it did not hold land open to public), *affirmed in part and in part reversed on other grounds* 256 Neb. 645, 592 N.W.2d 155 (1999) (reversing on separate issue but affirming Nebraska Court of Appeals' holding as to school district without discussion). Compare *Dykes v. Scotts Bluff Cty. Ag. Socy.,* 260 Neb. 375, 617 N.W.2d 817 (2000) (concluding viewing of livestock exhibits at county fair was not recreational purpose, but neither being asked nor reaching issue whether agricultural society was governmental entity).

The Nebraska Supreme Court first considered whether the RLA applied to governmental entities in *Watson v. City of Omaha, supra.* In *Watson,* the court held that the term "owner," as used in the RLA, includes a political subdivision as well as a private person. In so holding, the *Watson* court "concede[d] for the sake of argument that the original purpose of the [RLA] was to encourage private landowners to offer their lands for use by the public." 209 Neb. at 840, 312 N.W.2d at 258. The court also considered the language of the Political Subdivisions Tort Claims Act, which subjects a political subdivision to liability for the negligent acts or omissions of its employees "in the same manner and to the same extent as a private individual under like circumstances." See Neb. Rev. Stat. § 81-8,215 (Reissue 2003). The *Watson* court concluded that whatever the Legislature's intent at the time of the enactment of the RLA, the definition of "owner" in the act was sufficiently broad to cover a public entity. The court observed that the Legislature in enacting the Political Subdivisions Tort Claims Act was presumed to have knowledge of previous legislation, including the RLA. The court concluded that the intent of the Legislature, as reflected by the clear language of both the Political Subdivisions Tort Claims Act and the

RLA, was to grant the same rights and privileges to both governmental and private landowners. The court, in considering the facts of *Watson*, which involved "[s]lippery slide activities," held that while such activities were not specifically included within the definition of "recreational purposes" found in the RLA, the definition was broad enough to include the "normal activities afforded by public parks." *Watson v. City of Omaha*, 209 Neb. 835, 841-42, 312 N.W.2d 256, 259 (1981). In addition to the reasoning employed by the *Watson* court, we also note that the Nebraska Supreme Court has held that the provisions of the RLA apply to urban as well as rural areas. See, *Gallagher v. Omaha Public Power Dist.*, 225 Neb. 354, 405 N.W.2d 571 (1987); *Bailey v. City of North Platte*, 218 Neb. 810, 359 N.W.2d 766 (1984); *Garreans v. City of Omaha, supra*; *Watson v. City of Omaha, supra*.

■ We are mindful of the reservations about the continued application of *Watson* expressed by the concurring opinion in the recent case *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005), but as noted by the dissenting opinion in *Iodence*, the ruling in *Watson* is still the law. The doctrine of stare decisis is grounded on public policy and, as such, is entitled to great weight and must be adhered to unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so. *Holm v. Holm*, 267 Neb. 867, 678 N.W.2d 499 (2004). Bronsen has asked this court to answer the question "left unanswered" by *Watson*, that being whether the RLA applies if the urban park in question was open to the public before the RLA was enacted. Brief for appellant at 14. However, Bronsen is essentially asking for a judicial reconsideration of the holding in *Watson* that the term "owner," as used in the RLA, includes a political subdivision as well as a private person. Even if this court were inclined to agree with the arguments raised by Bronsen, we are bound by the Nebraska Supreme Court's ruling in *Watson*, which has not been overturned.

Given the reasoning employed by the Nebraska Supreme Court in *Watson* and the previous application of the RLA to city parks and other urban areas, we conclude that the district court

did not err in finding that the RLA was applicable in the present case. Bronsen's arguments to the contrary are without merit.

*Picnicking.*

Bronsen disputes the district court's finding that her activities at the time of her accident constituted "recreational purposes" within the meaning of the RLA. Bronsen argues that buying lunch and visiting a flea market are not among the outdoor physical activities contemplated in the definition of "recreational purposes." In support of her argument, Bronsen cites case law examining activities not specifically listed within the definition and employing the rule of ejusdem generis. Under the ejusdem generis rule, specific words or terms modify and restrict the interpretation of general words or terms where both are used in sequence. *Iodence v. City of Alliance, supra*; *Jensen v. Board of Regents*, 268 Neb. 512, 684 N.W.2d 537 (2004). Under the ejusdem generis canon of construction, when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed. *Dykes v. Scotts Bluff Cty. Ag. Socy.*, 260 Neb. 375, 617 N.W.2d 817 (2000).

Bronsen's arguments ignore the fact that the district court found that she was using the courthouse lawn for "picnicking," an activity specifically listed in the RLA's definition of "[r]ecreational purposes." See § 37-729(3). The word "picnic" is defined as "an outing or excursion, typically one in which those taking part carry food with them and share a meal in the open air." Webster's Encyclopedic Unabridged Dictionary of the English Language 1089 (1989). The record shows that Bronsen traveled from Utah to Nebraska to visit her family and partook in various outdoor activities associated with the 2002 Fur Trade Days celebration on the day of her accident. Just prior to Bronsen's accident, she and her family obtained buffalo burgers, beverages, and ice cream from stands located on or near the courthouse lawn; took those food items to an outdoor picnic table located on the courthouse lawn; and sat and visited while consuming their food. Bronsen was in the process of disposing of trash associated with the outdoor meal when her accident occurred. Given these undisputed facts in the record, we cannot say the district court

erred in concluding that Bronsen was using the courthouse lawn for picnicking at the time of her accident and that her activities thus constituted "recreational purposes" within the meaning of the RLA. We need not consider whether other activities engaged in by Bronsen on July 13, 2002, qualified as "recreational purposes," as such analysis is not necessary to our resolution of this appeal. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Livingston v. Metropolitan Util. Dist.*, 269 Neb. 301, 692 N.W.2d 475 (2005).

*Willful or Malicious Failure.*

Finally, Bronsen argues that the exception for willful failure to guard against a dangerous condition applies to the County's conduct in this case. In order for an action to be willful or wanton, the evidence must show that one acted with actual knowledge that a danger existed and that he intentionally failed to act to prevent the harm which was reasonably likely to result. *Gallagher v. Omaha Public Power Dist.*, 225 Neb. 354, 405 N.W.2d 571 (1987). The term "willful or wanton" imparts knowledge and consciousness that injury is likely to result from the act done or omission to act, and a constructive intention as to the consequences. *Id.* To constitute willful misconduct, there must be actual knowledge, or its legal equivalent, of the peril to be apprehended, coupled with a conscious failure to avert injury. *Id.* To constitute willful negligence, the act done or omitted must be intended or must involve such reckless disregard of security and right as to imply bad faith. *Id.* Wanton negligence has been said to be doing or failing to do an act with reckless indifference to the consequences and with consciousness that the act or omission would probably cause serious injury. *Id.*

The record shows that Connell had previously filled the hole which Bronsen stepped in during the accident which led to her injury. Connell testified that the fill material had apparently settled. There was no evidence that Connell knew this settling of the dirt had occurred in the hole at the time of the 2002 celebration. Viewing the evidence in a light most favorable to Bronsen and giving her the benefit of all reasonable inferences deducible

from the evidence, we cannot say that the district court erred in finding no willful or malicious action on the part of the County.

*Summary Judgment.*

In sum, the pleadings and evidence admitted at the hearing on the County's and FTD's motions for summary judgment disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the County and FTD were entitled to judgment as a matter of law. Viewing the evidence in a light most favorable to Bronsen and giving her the benefit of all reasonable inferences deducible from the evidence, we find no error in the district court's grant of the motions for summary judgment.

## CONCLUSION

The district court did not err in granting the County's and FTD's motions for summary judgment.

AFFIRMED.