CAROLYN BRONSEN, APPELLANT, V. DAWES COUNTY, NEBRASKA,
A NEBRASKA POLITICAL SUBDIVISION, AND FUR TRADE DAYS,
INC., A NEBRASKA CORPORATION, APPELLEES.
722 N.W.2d 17

Filed September 29, 2006.    No. S-04-237.

Maren Lynn Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, for appellant.

Michael J. Javoronok, of Michael J. Javoronok Law Firm, for appellee Dawes County.

Neleigh N. Korth and Tim W. Thompson, of Kelley, Scristmier & Byrne, P.C., for appellee Fur Trade Days.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

HENDRY, C.J.
## NATURE OF CASE
Appellant, Carolyn Bronsen, sustained personal injuries when she stepped into a hole or depression in the Dawes County, Nebraska, courthouse lawn. Bronsen was attending a historical celebration organized by Fur Trade Days, Inc. (FTD), a Nebraska not-for-profit organization. After complying with the notification requirements of Nebraska's Political Subdivisions Tort Claims Act (PSTCA), Neb. Rev. Stat. §§ 13-901 to 13-926 (Reissue 1997 & Cum. Supp. 2002), Bronsen filed a negligence action against Dawes County and FTD.

In response to defendants' motions for summary judgment, the district court found that under Nebraska's Recreation Liability Act (RLA), Neb. Rev. Stat. §§ 37-729 to 37-736 (Reissue 2004), Bronsen was using the courthouse lawn for a recreational purpose and that both Dawes County and FTD were owners under the RLA. Having determined that the RLA applied, the district court concluded that Dawes County and FTD were not liable for Bronsen's injuries because their conduct did not rise to the level of willful or malicious failure to act, a required showing for landowner liability under the RLA. The Nebraska Court of Appeals affirmed. *Bronsen v. Dawes County*, 14 Neb. App. 82, 704 N.W.2d 273 (2005). We granted Bronsen's petition for further review.

## BACKGROUND

The relevant facts taken from the Court of Appeals' opinion are set forth below:

> Bronsen's injuries occurred during the Fur Trade Days celebration in Chadron[, Nebraska] in July 2002. The celebration is arranged by FTD [and] takes place in Chadron each year on the second weekend of July. . . . Events and activities are held on the Dawes County courthouse lawn . . . . . Fur Trade Days also includes a parade, softball games throughout the weekend, and many other activities.

> The summary judgment record shows that at the time of Fur Trade Days in 2002, Bronsen, a resident of Utah, was visiting her parents in Chadron. Bronsen had not attended Fur Trade Days or visited the courthouse lawn prior to the July 2002 celebration. On July 13, Bronsen and her family watched the parade, walked through the flea market, and purchased buffalo burgers and beverages for lunch. Bronsen and her family sat at a picnic table on the courthouse lawn to eat their lunch, after which they planned to view the "[Native American] powwow." After lunch, Bronsen and her father went across the street to get bowls of homemade ice cream for the family to eat. Bronsen and her family visited while they ate the ice cream. As she walked across the courthouse lawn prior to her accident, Bronsen was able to feel that the lawn was uneven. Bronsen was also aware that her father had stepped in a hole in the courthouse lawn before the family first arrived at the picnic table. When

Bronsen and her family were done eating, Bronsen picked up some paper plates and bowls that had blown off the picnic table, intending to throw them away in a nearby trash can. On her way to the trash can, Bronsen stepped into a hole or uneven area and fell, breaking her ankle. Since the accident, Bronsen has had several surgeries to repair the break. At the time of her deposition in November 2003, Bronsen still had pain in her ankle. . . .

. . . .

Bronsen filed her operative complaint on May 12, 2003, setting forth a negligence claim against both the County and FTD. Specifically, Bronsen alleged that on July 13, 2002, she suffered personal injuries when she fell after stepping in a hole in the courthouse lawn while attending Fur Trade Days. Bronsen alleged that her fall was proximately caused by the negligence of the County in that it failed to (1) inspect the courthouse lawn for dangerous conditions, (2) maintain the lawn in a manner suitable for pedestrian traffic, (3) repair holes as they appeared in the lawn, (4) warn pedestrians of the existence of the hole, or (5) restrict traffic in the area of the hole so as to prevent pedestrians from falling there. Bronsen alleged that her fall was also proximately caused by the negligence of FTD as the occupier of the courthouse lawn on July 13. Bronsen alleged that FTD was negligent in the same respects as was the County. Bronsen further alleged that her injuries required treatment from health care providers, that she incurred medical expenses exceeding $1,000, and that she would continue to incur future medical expenses. Bronsen also sought recovery for disability, pain and suffering, and lost income, both past and future. Finally, Bronsen alleged that she had filed a tort claim on October 21 with the Dawes County clerk pursuant to Nebraska's [PSTCA], that more than 6 months had passed without response, and that she had withdrawn her claim on April 23, 2003. Bronsen sought judgment for her special damages in an amount to be proved at trial and for such general damages as were allowable by law.

In its answer, the County denied that any defect existed in the lawn at the county courthouse other than the inherent

uneven condition of the lawn itself due to the natural settling and rising of the soil. The County admitted that Bronsen fell on the lawn of the courthouse but alleged that Bronsen's fall was proximately caused by her own negligence. The County also contended that Bronsen's injuries "may not have been as she has alleged" and that Bronsen may have failed to mitigate her damages. The County alleged that it may be immune from liability because the premises were being used for recreational purposes as defined by § 37-729. . . . FTD filed an answer and subsequently an amended answer, making similar allegations and denials to those made by the County.

The County and FTD filed motions for summary judgment, which were heard by the district court on December 22, 2003. In addition to the evidence set forth above, the record at the summary judgment hearing included deposition testimony [and affidavit evidence from a number of witnesses].

. . . .

The district court entered an order on February 4, 2004, granting both motions for summary judgment. The court found that it was clear Bronsen "was using [the courthouse lawn] for picnicking, viewing historical events or recreations (pow wow) or otherwise using the land for purposes of the user" and that those uses would qualify as recreational purposes under § 37-729(3). The court found that the facts adduced showed that FTD qualified as an owner as defined by § 37-729(2), in that it was an occupant or person in control of the premises. The court found that the evidence showed that Bronsen was allowed to use the courthouse lawn without charge. The court stated that FTD was thus immune from liability unless there was a willful or malicious failure on its part. The court found that FTD had no knowledge of the hole and did not create the hole and that thus, there was no willful or malicious action on the part of FTD.

The district court concluded that the County's actions would also place it within the protection of the RLA. The court stated that in order to establish liability on the part

of the County, Bronsen was likewise required to show that its actions would amount to a willful or malicious failure. . . . The court concluded that there was no willful or malicious action on the part of the County.

The district court found no genuine issue as to any material fact and concluded that the County and FTD were entitled to judgment as a matter of law. Accordingly, the court granted the motions for summary judgment.

*Bronsen v. Dawes County*, 14 Neb. App. 82, 84-89, 704 N.W.2d 273, 277-80 (2005).

## ASSIGNMENTS OF ERROR

Bronsen assigns, restated, that the Court of Appeals erred in concluding that Dawes County, which was sued under the PSTCA, was immune from suit by application of the RLA. Bronsen also assigns that the Court of Appeals erred in affirming the district court's conclusion that her conduct fell within the definition of "picnicking," a recreational use of property under the RLA. Bronsen does not assign as error the district court's determination that FTD was an owner under the RLA.

## STANDARD OF REVIEW

■ Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Cole v. Isherwood*, 271 Neb. 684, 716 N.W.2d 36 (2006).

■ Statutory interpretation presents a question of law. *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *In re Estate of Mousel*, 271 Neb. 628, 715 N.W.2d 490 (2006).

## ANALYSIS

### MEANING OF "OWNER OF LAND" UNDER RLA

Bronsen argues, simply stated, that the RLA should not be applied to governmental entities. Bronsen specifically requests this court to reexamine its decision in *Watson v. City of Omaha*,

209 Neb. 835, 312 N.W.2d 256 (1981). In *Watson*, this court held that the limited immunity from liability afforded to owners of land under the RLA applies to governmental entities as well as private landowners. On three occasions since *Watson*, this court has explicitly reaffirmed its determination that the RLA's protection applies to governmental entities. *Thies v. City of Omaha*, 225 Neb. 817, 408 N.W.2d 306 (1987); *Gallagher v. Omaha Public Power Dist.*, 225 Neb. 354, 405 N.W.2d 571 (1987); *Bailey v. City of North Platte*, 218 Neb. 810, 359 N.W.2d 766 (1984). The *Watson* rule, however, was not unanimously embraced by this court. See, *Thies, supra* (White, J., dissenting); *Bailey, supra* (Grant, J., dissenting; White and Shanahan, JJ., join); *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984) (Shanahan, J., dissenting; White and Grant, JJ., join); *Watson, supra* (White, J., dissenting; McCown, J., joins). Beginning with *Watson*, a recurring issue presented to this court by RLA cases is whether the Legislature intended the RLA's protection to apply to governmental entities. We begin with a synopsis of the RLA.

The Legislature's stated purpose in enacting the RLA "is to encourage owners of land to make available to the public land and water areas for recreational purposes by limiting their liability toward persons entering thereon and toward persons who may be injured or otherwise damaged by the acts or omissions of persons entering thereon." § 37-730. Accordingly, under the RLA, "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes." § 37-731. This protection applies to landowners who directly or indirectly invite others to use their land for a recreational purpose so long as the owner does not charge a fee for the use of the land. § 37-732. The protection also applies to landowners who lease their property to the state for recreational purposes. § 37-733. Landowners are not, however, protected from liability "for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity." § 37-734(1). In considering willful and malicious conduct under the RLA, this court has stated:

> In order for an action to be willful or wanton, the evidence must show that [a landowner] acted with actual knowledge that a danger existed and that [the landowner] intentionally failed to act to prevent the harm which was reasonably likely to result. The term imparts knowledge and consciousness that injury is likely to result from the act done or omission to act, and a constructive intention as to the consequences. To constitute willful misconduct there must be actual knowledge, or its legal equivalent, of the peril to be apprehended, coupled with a conscious failure to avert injury. To constitute willful negligence the act done or omitted must be intended or must involve such reckless disregard of security and right as to imply bad faith. Wanton negligence has been said to be doing or failing to do an act with reckless indifference to the consequences and with consciousness that the act or omission would probably cause serious injury.

*Garreans*, 216 Neb. at 493, 345 N.W.2d at 314. Thus, if the RLA applies, landowners are protected from all but intentional or recklessly indifferent acts committed against persons entering onto their land.

After Bronsen filed her brief with the Court of Appeals on June 8, 2004, this court issued its opinion in *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005) (holding that football spectating is not "recreational purpose" within RLA's protection). As in earlier dissents, the *Iodence* concurrence concluded that this court in *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981), had incorrectly extended the RLA's protection to governmental entities. *Iodence, supra* (Hendry, C.J., concurring; Gerrard and McCormack, JJ., join). In deciding Bronsen's appeal, the Court of Appeals recognized the *Iodence* concurrence's "reservations about the continued application of *Watson*," but concluded that "[e]ven if this court were inclined to agree with the arguments raised by Bronsen," it was bound by the *Watson* rule as that decision had not been overturned. *Bronsen v. Dawes County*, 14 Neb. App. 82, 94, 704 N.W.2d 273, 283 (2005). In her petition for further review, Bronsen urges this court to adopt the rationale of the *Iodence* concurrence.

The main conflict related to applying the RLA to governmental entities stems from the RLA's definition of "owner" in § 37-729(2): "Owner includes tenant, lessee, occupant, or person in control of the premises." Subsection (2) does not explicitly define "owner" to include only private landowners; neither does the model act upon which the RLA was based. However, for the reasons stated in the *Iodence* concurrence, which we reiterate in part below, we now conclude that the RLA's protection was never intended to apply to governmental entities.

First, the Legislature's expressed purpose in granting limited immunity to landowners—to encourage them to make their land available to the public for recreational purposes—is historically not applicable to publicly owned recreational or park property. A governmental entity's primary purpose in owning such land is to make it available for public use. It needs no incentive to perform this traditional function. See, *Conway v. Town of Wilton*, 238 Conn. 653, 671-72, 680 A.2d 242, 252 (1996) ("[b]ecause [municipalities] are in the business of providing parks, pools, ball fields, etcetera, the legislature had less incentive to dangle the carrot of immunity to encourage municipalities to do what they historically have always done"); *City of Pensacola v. Stamm*, 448 So. 2d 39 (Fla. App. 1984) (concluding that recreational use statute is not intended to apply to governmental entities already charged with responsibility of acquiring and maintaining recreational property for general welfare of citizens). See, also, *National League of Cities v. Usery*, 426 U.S. 833, 851, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1976) (listing police protection, fire prevention, and parks and recreation as examples of typical activities performed by state and local governments "in discharging their dual functions of administering the public law and furnishing public services"), *overruled on other grounds, Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985) (rejecting traditional function test for determining whether state and local government activities are immune from federal regulation). Compare Neb. Rev. Stat. § 2-3229 (Reissue 1997) (providing purposes of natural resource districts, including "development and management of recreational and park facilities"). Any governmental incentive was particularly unnecessary in 1965 when,

as discussed *infra*, governmental entities already enjoyed sovereign immunity.

Second, the term "owner of land" under § 37-729(2) cannot be consistently construed to include governmental entities. Under § 37-733,

> [a]n owner [of land] who leases land to the state for recreational purposes shall not by giving such lease (1) extend any assurance to any person using the land that the premises are safe for any purpose, (2) confer upon such persons the legal status of an invitee or licensee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of a person who enters upon the leased land.

A landowner's leasing of land to the state under § 37-733 includes the leasing of land to political subdivisions. See *Teters v. Scottsbluff Public Schools*, 256 Neb. 645, 652, 592 N.W.2d 155, 160 (1999) ("[i]f the landowner charges for the use of the land, then the landowner is not protected by the [RLA] unless the land is leased to the state or a subdivision thereof"). But, if "owner of land" under § 37-729(2) includes governmental entities, then § 37-733 must be read to authorize a governmental entity to lease land to itself and, by doing so, avoid liability for ordinary negligence. This reading is nonsensical, supporting our conclusion that the Legislature did not intend for an "owner of land" to include governmental entities. See, *In re Petition of SID No. 1*, 270 Neb. 856, 867, 708 N.W.2d 809, 819 (2006) ("[i]t is not within the province of a court to read a meaning into a statute that is not warranted by the legislative language"); *Troshynski v. Nebraska State Bd. of Pub. Accountancy*, 270 Neb. 347, 352, 701 N.W.2d 379, 384 (2005) ("[s]tatutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme and so that effect is given to every provision"). See, also, *Conway v. Town of Wilton*, 238 Conn. 653, 665, 680 A.2d 242, 249 (1996) (concluding that lease provisions of recreational use statute, based on model act, created latent ambiguity by suggesting that "the legislature did not intend public and private 'owners' to be treated identically under the statute").

Third, as noted by the dissent in *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981), the Legislature had no

reason to believe that governmental entities were in need of liability protection under the RLA when it was enacted in 1965 because, at that time, governmental entities were already immune from liability under the common-law doctrine of sovereign immunity. It was not until 1968, 3 years after the passage of the RLA, that this court partially abrogated the doctrine as a defense against tort liability arising out of governmental operations, specifically the ownership, use, and operation of motor vehicles. *Brown v. City of Omaha*, 183 Neb. 430, 160 N.W.2d 805 (1968) (holding that because doctrine was originally common-law rule, this court may modify it in absence of legislative action to contrary). See, also, *Stadler v. Curtis Gas, Inc.*, 182 Neb. 6, 151 N.W.2d 915 (1967) (discussing lack of immunity for governmental propriety activities). It was not until 1969, 4 years after the passage of the RLA, that the Legislature waived sovereign immunity for the State of Nebraska and its political subdivisions pursuant to the State Tort Claims Act, see Neb. Rev. Stat. §§ 81-8,209 to 81-8,235 (Reissue 2003), and the PSTCA. Simply stated, in 1965, sovereign immunity was an extant defense to tort liability related to the recreational use of public land. Therefore, the Legislature could not have intended to include governmental entities as landowners in need of liability protection under the RLA.

Fourth, construing "owners of land" to include governmental entities allows those entities to treat claimants differently depending upon whether their injuries were incurred during recreational or nonrecreational activities. *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005) (Hendry, C.J., concurring; Gerrard and McCormack, JJ., join). For claims related to nonrecreational activities on public property, a governmental entity's duty would be determined under the PSTCA or the State Tort Claims Act, while claims related to recreational activities would be determined under the RLA. This court has previously dealt with the difficulty presented by a plaintiff's subjective intent in using public property in *Veskerna v. City of West Point*, 254 Neb. 540, 578 N.W.2d 25 (1998).

In *Veskerna*, this court held that the RLA could not exempt a city from its duty to maintain a public street based on the subjective intent of a member of the public when the city allegedly

failed to close the street to traffic during an automobile show event. Thus, when public property is primarily intended for a nonrecreational purpose, "[m]erely changing the use to which public lands are put cannot change the liability of the owner to members of the public who use the property." *Id.* at 544, 578 N.W.2d at 28. This court reasoned that the Legislature could not have intended to create separate classes of plaintiffs based upon the individual subjective intent of the plaintiffs in using public property. *Id.*

This case presents a similar issue, except that here the public property was, arguably at least, available for both recreational and nonrecreational purposes. The following hypothetical illustrates the unreasonableness of allowing a claimant's fortuitous purpose in using public property to become an outcome-determinative factor in deciding whether to apply the liability standard of the PSTCA or the RLA.

In the 1970's, the Nebraska State Capitol Building was listed on the National Register of Historic Places, and the Nebraska State Capitol landscape was added in 1999. Given that the Capitol is a historical site, assume the following: As frequently occurs in late spring, groups of children from across the State of Nebraska arrive in schoolbuses to tour and visit the State Capitol. After exiting their buses and entering the Capitol through the east vestibule, a piece of the Capitol's facade breaks loose, striking and seriously injuring two of the children. The same piece of facade also strikes and seriously injures an individual coming to the Capitol with the intent of testifying at a legislative hearing. As to the children who came to the Capitol for a recreational purpose, see § 37-729(3) (defining recreational purpose to include "visiting, viewing, or enjoying historical . . . sites"), the State's liability to them would be limited to its "willful or malicious failure to guard or warn against a dangerous condition." § 37-734. See, also, *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984). As to the individual coming to the Capitol to testify at a legislative hearing, whose purpose would clearly not be recreational under the RLA, the State's liability would be determined under the rubric of ordinary negligence, i.e., the duty to conform to the legal standard of reasonable conduct in light of the apparent risk. See, e.g., *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999).

If the RLA were interpreted to apply to public property serving dual purposes, it takes little effort to envision numerous circumstances in which substantially different liability standards would apply to the same incident or injury depending upon the claimant's reason for using the property. See, e.g., *Hovland v. City of Grand Forks*, 563 N.W.2d 384 (N.D. 1997) (noting that if recreational use statute were interpreted to include governmental entities as owners, outcome would be different for bicyclist using bike trail to go to work versus skater using trail for recreation). As in *Veskerna v. City of West Point*, 254 Neb. 540, 543, 578 N.W.2d 25, 27 (1998), "we cannot presume that the Legislature intended to create separate classes of plaintiffs based upon the individual subjective intent of [such] plaintiffs in using the property."

Fifth, as noted in the concurrence in *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005), interpreting the PSTCA as incorporating the RLA's limited immunity is essentially a revocation of the state's general waiver of immunity in the PSTCA. Dawes County argues that because § 13-908 provides that a governmental entity's liability is the same as an individual's liability, it is entitled to the same limited immunity that would be afforded to a private landowner under the RLA.

In relevant part, § 13-908 provides: "Except as otherwise provided in the [PSTCA], in all suits brought under the act the political subdivisions shall be liable in the same manner and to the same extent as a private individual under the circumstances . . . ." See, also, § 81-2,215 (providing same language in waiver section of State Tort Claims Act). We recognize that courts have applied recreational use immunity to governmental entities through similar language in a tort claims act. See, e.g., *DiMella v. Gray Lines of Boston, Inc.*, 836 F.2d 718 (1st Cir. 1988); *Johnson v. New London*, 36 Ohio St. 3d 60, 521 N.E.2d 793 (1988). However, this case amply illustrates how the concept of "derivative immunity" in this circumstance conflicts with Nebraska's PSTCA because it involves a claim that clearly falls within the state's waiver of immunity under the PSTCA.

The PSTCA was enacted to "abolish the long existing doctrine of sovereign or governmental immunity which has prevented recovery from Nebraska's [political subdivisions] for the

torts of [the political subdivision's] officers, agents, and employees." Introducer's Statement of Purpose, L.B. 155, Committee on Judiciary, 80th Leg., 1st Sess. (February 3, 1969). This court has recognized that the quoted language in § 13-908 sets forth a general waiver of immunity subject to specified exemptions in § 13-910. *McCormick v. City of Norfolk*, 263 Neb. 693, 641 N.W.2d 638 (2002); *Lawry v. County of Sarpy*, 254 Neb. 193, 575 N.W.2d 605 (1998) (contrasting PSTCA's general waiver of immunity, subject to limited exceptions, with statute conferring general grant of immunity, subject to specified exceptions). One of the PSTCA's exemptions limits claims against a political subdivision for its

> failure to make an inspection or making an inadequate or negligent inspection of any property *other than property owned by or leased to such political subdivision* to determine whether the property . . . contains a hazard to public health or safety unless the political subdivision had reasonable notice of such hazard or the failure to inspect or inadequate or negligent inspection constitutes a reckless disregard for public health or safety.

(Emphasis supplied.) § 13-910(3). See, also, § 81-8,219(7) (providing same exemption under State Tort Claims Act).

In this exemption, the Legislature clearly contemplated claims involving the failure of governmental entities to conduct inspections of property it does not own or lease. See, e.g., Neb. Rev. Stat. §§ 14-102(31) to (33) (Cum. Supp. 2004), 48-418.10 and 48-722 (Reissue 2004), and 71-1,147.64 and 71-1559 (Reissue 2003). In those circumstances, a claim is precluded unless the claimant can prove that the governmental entity's failure to inspect, or properly inspect, amounted to a reckless disregard for public safety or occurred despite its knowledge of a hazard to the public. This heightened liability standard is comparable to what a plaintiff must meet in order to hold a landowner liable under the RLA. If the Legislature had intended to impose this higher liability standard in claims against governmental entities for their failure to inspect property they owned or leased, it would not have specifically excluded such property from § 13-910(3). By excluding public property in this fashion and reading the statute as a whole, the Legislature has shown

an intent to be liable for ordinary negligence with respect to publicly owned or leased property. Our past interpretation of the RLA is simply inconsistent with the Legislature's intent in § 13-910(3) to include liability for "negligent inspection" of publicly owned property within its general waiver of immunity.

Finally, applying the RLA to governmental entities ignores the purpose of the RLA, which was to provide an incentive to *private* landowners to open their *private* land to the public for recreational purposes. As noted in the concurrence in *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005), the RLA's intended application to only private landowners is clearly shown by its legislative history. See, *Conway v. Town of Wilton*, 238 Conn. 653, 680 A.2d 242 (1996) (overruling prior decision holding that "owner" included municipalities and concluding that definition of "owner," which was identical to model act, was ambiguous when court considered legislative history and public policy underlying statute); *Monteville v. Terrebonne Par. Con. Gov't*, 567 So. 2d 1097 (La. 1990) (noting that state legislature had adopted model act almost without change, including definition of owner; concluding that act applied only to private owners); *Stamper v. Kanawha County Bd. of Educ.*, 191 W. Va. 297, 298 n.4, 445 S.E.2d 238, 239 n.4 (1994) (concluding that state legislation fashioned after model act was intended to benefit private landowners despite legislature's slight modification to specify that owner " 'shall include, but not be limited to, tenant, lessee, occupant or person in control of the premises' "). See, also, *Hovland v. City of Grand Forks*, 563 N.W.2d 384 (N.D. 1997).

The model act, which the Legislature adopted almost verbatim, contains an introductory commentary specifically providing that the act is " 'designed to encourage availability of *private* lands . . . .' " (Emphasis in original.) *Iodence*, 270 Neb. at 72, 700 N.W.2d at 570 (setting out introductory commentary in its entirety), quoting 24 Council of State Governments, Suggested State Legislation 150 (1965). This purpose precludes applying the RLA's immunity to governmental entities through § 13-908. Even if governmental entities are entitled to be treated the same as private individuals by virtue of the PSTCA, they cannot own *private* land. Governmental entities own only *public* land.

In arguing that *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981), was correctly decided, FTD contends that (1) the Legislature has acquiesced in this court's holdings that the RLA's protection applies to governmental entities and (2) the doctrine of stare decisis is entitled to great weight.

■ It is true that ordinarily, where a statute has been judicially construed and that construction has not evoked an amendment from the Legislature, it will be presumed that the Legislature has acquiesced in the court's determination of its intent. *State v. Neiss*, 260 Neb. 691, 701, 619 N.W.2d 222, 229 (2000). However, this proposition of statutory construction cannot preclude an appellate court from concluding that its earlier construction of a statute is incorrect. The proposition is normally applied when an appellate court has concluded that its earlier construction is accurate. If the proposition were applied as a rule in every case involving statutory construction, no judicial construction of a statute could be overruled in the absence of legislative action.

■ Similarly, the doctrine of stare decisis was never intended to indefinitely perpetuate erroneous decisions. See *Holm v. Holm*, 267 Neb. 867, 678 N.W.2d 499 (2004). The doctrine of stare decisis is grounded on public policy and, as such, is entitled to great weight and must be adhered to unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so. *Id.* The doctrine is not absolute because no court is infallible. *Stonehill College v. Com'n Against Discrim.*, 441 Mass. 549, 808 N.E.2d 205 (2004).

For the reasons stated above, we conclude that our decision in *Watson, supra*, was manifestly wrong, and it is overruled. Therefore, the district court's judgment granting summary judgment to Dawes County must be reversed.

### Meaning of "Picnicking" Under RLA

As noted, the district court also concluded that FTD qualified as an owner as defined by § 37-729(2) in that it was an occupant or person in control of the premises. Bronsen does not dispute this classification. She assigns, however, that her conduct did not fall into the category of "picnicking," a protected recreational purpose under § 37-729(3). We have reviewed the district

court's findings and the Court of Appeals' analysis of those facts. Viewing the evidence in the light most favorable to Bronsen, and giving her the benefit of all reasonable inferences, we cannot say the Court of Appeals erred in affirming the district court's finding that Bronsen was picnicking. This assignment of error is without merit.

## CONCLUSION

We conclude that the limited immunity afforded to owners of land by the RLA was intended to apply only to private landowners who make their property available to the public for recreational purposes, and not to governmental entities. Accordingly, we overrule our prior holdings in *Watson v. City of Omaha*, 209 Neb. 835, 312 N.W.2d 256 (1981); *Bailey v. City of North Platte*, 218 Neb. 810, 359 N.W.2d 766 (1984); *Gallagher v. Omaha Public Power Dist.*, 225 Neb. 354, 405 N.W.2d 571 (1987); and *Thies v. City of Omaha*, 225 Neb. 817, 408 N.W.2d 306 (1987). To the limited extent the following cases can be read as implicitly holding that the RLA applies to governmental entities, they are also overruled: *Iodence v. City of Alliance*, 270 Neb. 59, 700 N.W.2d 562 (2005); *Teters v. Scottsbluff Public Schools*, 256 Neb. 645, 592 N.W.2d 155 (1999); *Veskerna v. City of West Point*, 254 Neb. 540, 578 N.W.2d 25 (1998); *McIntosh v. Omaha Public Schools*, 249 Neb. 529, 544 N.W.2d 502 (1996); *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984).

Thus, we conclude that the Court of Appeals' decision must be reversed with respect to Dawes County and the cause remanded with directions to the Court of Appeals to remand the cause to the district court for further proceedings consistent with this opinion.

With respect to FTD, the Court of Appeals' determination that the district court did not err in granting its motion for summary judgment is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

WRIGHT, J., not participating.